**UNITED STATES v. MONJAR et al.**
**SAME v. MOORE et al.**
**No. 8416–8427.**

Circuit Court of Appeals, Third Circuit.

Argued May 4, 1944.

Decided Dec. 1, 1944.

As Amended Feb. 26, 1945.

918

See, also, United States v. Lindh, 3 Cir., 148 F.2d 332.

Daniel O. Hastings, of Wilmington, Del. (Ayres J. Stockly and John Van Brunt, Jr., both of Wilmington, Del., on the brief), for appellants.

Stewart Lynch, of Wilmington, Del., and E. Russell Kelly, of Washington, D. C. (Robert S. Rubin, Sp. Counsel, and W. Victor Rodin, ·Atty., Securities and Exchange Commission, both of Philadelphia, Penn., on the brief), for appellee.

Before JONES and McLAUGHLIN, Circuit Judges, and GANEY, District Judge.

McLAUGHLIN, Circuit Judge.

There were two indictments in these cases. Under the first, covering appeals Nos. 8416 to 8420, inclusive, the defendants, Hugh B. Monjar, Josephine T. Monjar, Abraham J. Cook, John Fenton Jones and Clement O. Drew were indicted for: violations of the Mail Fraud Act, 18 U.S.C.A. § 338; for violations of the fraud provisions of the Securities Act, 15 U.S.C.A. § 77q (a) (1), and for conspiracy to violate the Mail Fraud Statute and the fraud provisions of the Securities Act, 18 U.S.C.A. § 88. There were twenty-five counts in the first indictment. Counts 1 to 15, inclusive, 23 and 24, charged violations of the Mail Fraud Statute. Counts 16 to 22, inclusive, charged violations of the fraud sections of the Securities Act. Count 25 charged conspiracy to violate the Mail Fraud Statute and the fraud provisions of the Securities Act. The court directed verdicts in favor of the defendants on counts 1, 4, 9, 19 and 22. All of the defendants to the first indictment were found guilty on all remaining counts with the exception of Josephine T. Monjar, who was found guilty under the conspiracy count alone.

The second indictment, embracing appeals Nos. 8421 to 8427, inclusive, consists of a single count for conspiracy. It is similar to count 25 in the first indictment, with nine additional paragraphs added which set up acts and conduct of the second group of defendants after the first indictment had been returned. There were twelve persons originally named in the second indictment. Ten of these were tried. Leo F. Jones, Geenty and Clark, were acquitted by the jury. Moore, Lindh, Fitzpatrick, Willard, Candlin, Cruser and Maddams were convicted. The cases were tried together over a period of four months and consumed sixty trial days. These appeals are on behalf of all of the persons who were convicted.[1]

---

[1] The statutes involved are:

18 U.S.C.A. § 338 which proved, among other things, that,—"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of

The appellants urge: (1) That their demurrers to the indictments should have been sustained: (2) That their requests for bills of particulars should have been allowed: (3) That the evidence was insufficient to support a verdict of guilty as to any defendant on any count of either indictment. In addition to this general proposition, it is also contended that the evidence was insufficient to sustain the convictions of John Fenton Jones, Josephine T. Monjar, two of the defendants in the first indictment, and of Moore, Lindh, Cruser, Fitzpatrick, Candlin, Willard and Maddams, the defendants who were convicted under the second indictment: (4) That there were errors by the court consisting of; failure to properly admonish the jury concerning certain opening comment by the United States attorney and in making prejudicial remarks to the jury in the course of an exception being noted to this; in making a statement regarding the presence of the defendants in court; in certain evidence rulings, and in the charge.

It is stressed on the demurrer argument that no count of either indictment set forth with sufficient accuracy and particularity any crime, did not inform the defendants of a specific offense charged against them, and did not protect any of the defendants against subsequent prosecution. As stated, the first count of the first indictment and the single count of the second indictment are practically identical. They charge that the defendants from January 1, 1928, up to the date of the respective indictments devised, and intended to devise, a scheme and artifice to defraud various persons who were and are members of an organization known as the Mantle Club and to obtain from them by means of false and fraudulent representations and promises, their money and property. The scheme and artifice is related with great detail in the succeeding fifty-one paragraphs which take up twenty-two printed pages of the appendix. The next fourteen counts of the first indictment charge that the defendants thereto mailed, or caused to be mailed, certain letters, which are set out in full, in connection with the fraud and contrary to the statute, etc. The twenty-third and twenty-fourth counts of the first indictment allege receipt by the defendants through the mails, of letters in connection with the fraud. The sixteenth to twenty-second, inclusive, counts of the first indictment charge that the defendants employed the fraudulent scheme in the sale of certain evidences of indebtedness by the use of means and instruments of communication in interstate commerce and by use of the United States mails. The particular documents referred to are set out in full. The twenty-fifth count of the first indictment, for conspiracy to violate the Mail Fraud Act and the Securities Act, incorporates the reference count 1 as part of it and charges the commission of eleven separate overt acts for the purpose of effecting the object of the conspiracy. The second indictment charges that the defendants there named conspired to violate the Mail Fraud and Securities Act. It details the same charges as set out in the first count of the first indictment with additional allegations, as a further part of the scheme, of acts and conduct on the part of the defendants, together with those named in the first indictment, at or about the time of the return of the first indictment and thereafter. The indictment concludes by stating twelve overt acts of the defendants.

The entire alleged fraudulent scheme is disclosed in the voluminous indictments. Its alleged object, namely, to fraudulently obtain money from members of a club promoted by the appellants is plainly stated. The money was obtained from the members in various ways; through initiation fees and dues, through personal loans to the defendant, Hugh B. Monjar, through sales of the Key Magazine, through sales of two ethics books of Hugh B. Monjar and through payments for ritual costumes. All of this, including the use of the

---

false or fraudulent pretenses, representations, or promises, * * *, shall, for the purpose of executing such scheme or artifice or attempting so to do, place, or cause to be placed, any letter, * * *, in any post office, * * *, to be sent or delivered by the post office establishment of the United States, or shall take or receive * * * therefrom, * * * any such letter, * * *, shall be fined not more than $1,000, or imprisoned not more than five years, or both."

15 U.S.C.A. § 77(a) (1) provides:

"It shall be unlawful for any person in the sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

"(1) to employ any device, scheme, or artifice to defraud, * * *."

United States mails in the mail fraud counts and the use of means and instruments of communication in interstate commerce and of the United States mails in connection with the security counts is gone into at considerable length.

■ The defendants in their demurrers especially attack the security counts alleging no violation of the Securities Act because no use of the mails or telegraph is stated which induced a purchase of a security or a use of those facilities in the delivery of a security. They argue that there was no offense under the statute because the communications were not addressed by the defendants or some of them directly to the persons to whom it was intended to make a sale. We fail to see the justification of any such attempted narrow construction. Loan meetings of the branch units of the club were the heart of that part of the charged fraud concerning the sale of loans. The primary purpose of such meetings was to sell PL loans. Knowledge of what happened at those meetings and their tangible results in the form of cash statements and covering bank drafts were necessary to the defendants. That information was supplied by the letters and telegrams which are the source of the security counts.[2] Those letters and telegrams were all sent to Cook, the treasurer of the club, by one or the other of his co-defendants or by a loan agent. Obviously, they were in furtherance of the sale of the loans.

The case of United States v. Williams, 1 S.E.C. Jud.Dec. 51 (D.C.S.D.Cal.1935), unreported officially, is urged by the defendants in support of their position on this point. That decision is not applicable on its facts. The court points out in that case that the letter there involved "was sent, as stated, on the advice of a Deputy District Attorney, and, certainly, it was not sent for the purpose of doing anything in conjunction with the scheme." In Kopald-Quinn & Co. v. United States, 5 Cir., 101 F.2d 628, certiorari denied Ricebaum v. United States, 307 U.S. 628, 59 S.Ct. 835, 83 L.Ed. 1511, it was charged that the scheme of the defendants was to unload worthless stocks on their customers and not as they pretended, to serve their customers by helping them make money. The selling was done by verbal contact and negotiation.

The only use of the mails had to do with written confirmations of sales. The defendants stressed, as here, that there was no use of the mails to effect sales and that the use of the mails proven was consequent upon and after the making of a sale and merely incidental. It was also contended that to constitute an offense under the Securities Act it was necessary to prove a scheme to effect sales and the actual making of sales of securities by mail. The court said (101 F.2d page 632): "We think the construction thus urged for the Act unduly narrows the language used in it, unduly limits its scope and effect. We think the count alleges an offense under the Act, and that the proof supports the allegation."

In Pace v. U. S., 5 Cir., 94 F.2d 591, letters expressing thanks for orders for stock given to defendant's salesman were held to sufficiently charge offenses under the Securities Act. The demurrer was overruled in that case. In Landay v. United States, 6 Cir., 108 F.2d 698, which concerned another offense under Section 17 (a) (1) of the Securities Act, the only mailing alleged was of a letter acknowledging receipt of an order to purchase and a check received in payment for the security. The conviction was there upheld. On the demurrer motion the defendants also question the sufficiency of the description of the security involved in the security counts of the first indictment and which in those counts is called "certain evidence of indebtedness." This is one of the statutory definitions given the term "security." It is admitted by the appellants in their brief that the words of the statute are pleaded. Coplin v. U. S., 9 Cir., 88 F.2d 652, certiorari denied 301 U.S. 703, 57 S.Ct. 929, 81 L.Ed. 1357, involved an indictment under the Securities Act of selling stock. The particular count of the indictment there set out facts and also charged the offense in the words of the statute. The court said at page 659 of 88 F.2d: "It is well settled that, as a general rule, the latter mode of pleading in an indictment is of itself sufficient."

In Pounds v. U. S., 171 U.S. 35, 18 S. Ct. 729, 43 L.Ed. 62, the statutory offense had to do with the illegal removal of spirits under Section 3296 of the Revised Stat-

---

[2] Two of the cash reports, those set out in the seventeenth and twenty-third counts, refer to attached bank drafts for the total amounts shown in the reports to have been collected at those particular meetings.

utes, 26 U.S.C.A. Int.Rev.Code, § 2913. It was claimed that the indictment was too uncertain to sustain the judgment. The court held at page 38 of 171 U.S., page 730 of 18 S.Ct.: "The offense was purely statutory. In such case it is generally sufficient to charge the defendant with acts coming within the statutory description in the substantial words of the statute without any further expansion of the matter."

In the recital of the fraudulent scheme in the first count of the first indictment, which is the reference count, there is mention of the personal loans which are the securities upon which the security counts of the indictment are founded. A copy of the personal loan receipt form referred to by the phrase "evidence of indebtedness" was furnished the defendants in the government's bill of particulars.

■ It seems to us that the indictments presented to the defendants and to the trial court a fair picture of the essential elements of the crimes charged and that the District Court was correct in sustaining their sufficiency. Hagner v. United States, 285 U.S. 427, 52 S.Ct. 417, 76 L.Ed. 861; United States v. Hess, 124 U.S. 483, 8 S.Ct. 571, 31 L.Ed. 516; United States v. Cruikshank, 92 U.S. 542, 23 L.Ed. 588.

■ The next point is that the District Court erred in its decision on the defendants' various motions for bills of particulars. It is conceded by the appellants that such matter is for the discretion of the trial judge but they suggest that the latter did not properly exercise that discretion. The argument regarding particulars took three days with numerous additional informal conferences. There is no indication that because of the court's refusal to allow all of the particulars requested, that the appellants were prevented from producing any witness or documentary evidence. It is apparent that there was ample time and opportunity for the defendants to present their case in the fullest possible measure. The appellants' main brief goes into the question at length but fails to show even any surprise occurring during the trial. The situation here is utterly unlike those in the case of Singer v. United States, 3 Cir., 58 F.2d 74, and cases of that type cited by the appellants. Our own search of the voluminous transcript does not disclose any material harm to the defense as the result of a denial of part of the defendants request for particulars.

It is then vigorously urged that the evidence was insufficient to support a verdict of guilty as to any defendant on any count of either indictment because the evidence fails to prove the alleged scheme to defraud beyond a reasonable doubt.

The evidence showed that the alleged scheme to defraud consisted of a promotion by the appellants of a membership club over a period from early in 1928 to and beyond December, 1941, with the ultimate object of obtaining money and property from the club members. The club was founded around the personality of the defendant, Hugh B. Monjar. He had organized a more or less similar group in 1924 which was called the Decimo Club. Some of the appellants had been associated with him in that venture and in collateral organizations stemming from it. Monjar and his group were ousted from the Decimo Club and its affiliates in December, 1927. Immediately, the new group, which eventually developed into the Mantle Club, got under way. People were persuaded to join through a series of pretenses, promises and representations which gave rise to a position of trust and confidence between the defendants and the persons who became members. These latter are referred to in the indictments as the "victims." The ramifications of this fantastic affair were elaborate but in its essence the scheme was simple.

Monjar was the base. He was presented to the members as an amazing combination of pure idealism and practical business ability. Utter loyalty to him and confidence in him were constantly stressed. The Mantle group in 1928 consisted of 125 persons. The membership does not seem to have greatly expanded until 1933 when it became a national organization. There was evidence that $7,666,631 was obtained from the members. $3,216,916.50 of that sum was received by the national board of governors of the Mantle Club from initiation fees and a portion of the monthly membership dues, paid by the members. $1,759,-844.50 of the monthly dues money was retained by the local boards of governors of various cities where the Mantle Club had been installed. $1,106,114 was advanced to Monjar by the members as personal loans which are the type of loan referred to in the testimony as PLs. $190,324 was advanced by members in the form of personal loans called CDs, simply a variation of the PLs. The corporation for publish-

ing the Key Magazine was organized in 1933 with Monjar, editor; J. F. Jones, president and Cook, vice president and treasurer. The articles in the magazine were originally all written by Monjar. Later the defendants, J. F. Jones and John F. Fitzpatrick, contributed material. From sales of this magazine to members, the sum of $526,928 was realized. Two of Monjar's books, known as the Code and Supplement to the Code, had sales to members amounting to $311,522 and $203,982 respectively. There was a costume company organized to sell ritual costumes to members. This costume company actually obtained $750,000. Of this the members paid $351,000 directly and the balance was paid by the national board of governors from its share of the monthly membership dues and initiation fees.

The evidence involved all of the defendants as active participants in the matters involved in the indictments. Monjar was the leader from the beginning. Mrs. Monjar was his secretary for a time and later became president of the Golden Braid Costume Company. John Fenton Jones and Cook were perhaps the closest to Monjar. They, with him, comprised the original three members of the board of governors of the club. Jones, in addition, was the secretary, and Cook, the treasurer. Drew was the field man in touch with the local groups. The Board of Governors was expanded to ten members in 1940 and was made up of defendants Monjar, Cook, Drew, Lindh, Moore, Willard, Candlin, Cruser and William C. Martin. Prior to the first indictment, Martin was inducted into the United States Army. He resigned from the board and J. F. Jones, who had withdrawn from the board between 1940 and 1942, succeeded him. J. F. Jones, Cook, Candlin, Cruser, Drew, Willard and Moore had been connected with Monjar prior to 1928 in the Decimo Club and its various corporations. The defendant, Maddams, was an employee of the board of governors who, admittedly, spent more than half his time working on the personal loan records. After the first indictment, Maddams, Cook and Candlin were appointed liquidating trustees for Monjar with Maddams acting as secretary.

In connection with this point the appellants call attention to that part of the court's charge which embodied requests of the defense and reads:

"The scheme to defraud alleged in the indictments in these cases is substantially as follows, viz: The defendants planned, prior to the creation of the Mantle Club in 1928, to create that Club as a vehicle or instrument to be used by the defendants in the perpetration of a fraud or frauds upon its prospective members after the organization of said Club.

"In order to find a verdict of guilty against any defendant under any count in these indictments, it is necessary for the jury to find beyond a reasonable doubt that the scheme to defraud was devised prior to the organization of the Mantle Club, which occurred during 1928."

They submit that there was no proper or sufficient evidence "for the jury to find beyond a reasonable doubt that the scheme to defraud was devised prior to the organization of the Mantle Club which occurred during 1928."

The actual date of the organization of the Mantle Club was not a vital part of the government's case. The fraudulent scheme as charged and proved was not simply the formation of the Club. That was merely a part of the grand plan, the Trojan horse from which the defendants operated. The time element in the mail fraud offenses was important only in the sense that under the statute the scheme had to be devised prior to the use of the mails. Quite the same situation existed as to the security counts where again, on that phase of the crimes there charged, all that was necessary was that the fraudulent device had to be in existence at the time of "the sale of any securities by the use of any means of instruments of transportation or communication in interstate commerce or by the use of the mails directly or indirectly." In view of this the trial judge imposed undue burden on the government by charging the defense requests. Even so, there was strong testimony in the case justifying the jury in finding, as the verdict implies, that the scheme was devised prior to the formation of the Mantle Club in 1928.

The proofs clearly indicated that the Mantle Club sprang directly from the ruins of Monjar's Decimo Club. Monjar and his group, some of whom are defendants here, were, as stated, removed from control of the Decimo Club in the latter part of 1927. Directly thereafter the reconstruction of the same sort of organization was commenced, as Jones said, "to carry

out the purposes Mr. Monjar always had had in mind." His testimony is that "The Decimo Club was similar in operation to the Mantle Club." As late as November 20, 1935, in a letter to A. C. Crockett of the Seattle Club he said, "Decimo has gone. Its ideals live on in the person of H. B. Monjar and the Mantle Club." There was a statement from the defendant Cook in evidence in which he, giving the history of the Mantle Club, says "In December of 1927, I with a few other men made contact with Mr. Monjar for the express purpose of finding out what could be done in order to keep the idea of the Decimo Club alive and to render what assistance we could to further the continuation of the general idea of the Decimo Club." On January 13, 1928, Monjar, replying to a letter regarding the formation of what became known as the Mantle Club, said: "I can consider accepting the leadership however, only if I can be permitted to have around me the tried and trusted men who have been of incalculable value to me in the past. It is absolutely necessary to have men who have been thoroughly trained in his work by years of experience." As to the title of the Club, Jones said: "Mr. Monjar selected it because of a significance it would have in the ritual work." Later the Golden Braid Costume Company was formed by the appellants to supply the ritual costumes. That concern sold over 50,000 such costumes to the Club, thousands of which were never even delivered.

Regarding early personal loans, the following appears in Jones' testimony:

"Q. Now, were there any personal loans passing back and forth during that period between possibly 28 and possibly 33? A. Well, there were no transactions designated as 'Personal Loans' in the sense that has been mentioned here. It was necessary at many times for the members of the group who had outside jobs to furnish additional money, and over and beyond the service charge or the assessment, and that money was loaned and then repaid as it could be."

There is no indication from the evidence that there was ever any change in the objectives of the appellants. The fundamental idea from the latter part of 1927 was to organize a group similar to the defunct Decimo Club and founded on the ideas Monjar "always had had in mind." Its slow progress in the beginning is in part explained by Jones, who said that there

were intermittent discussions in 1928 "having to do with the constitution and by-laws, with the setup of the organization", but that they were still engaged in the Decimo legal fight and with a new Monjar corporation which had been formed and "did not have the time and experienced men to devote to the formation of the Mantle Club. In other words we were more concerned with starting out on a proper basis, that (than) starting out and expanding it rapidly." He stated that there were a few meetings—not very many that year. From the testimony of Jones and other evidence in the case, it is clear that while the formation resolution of the Mantle Club was not adopted until January 17, 1929, the Club did in fact begin in 1928. From 1929 to 1933 the Club was active, though on a small scale. From 1933 on it grew into a country-wide structure with eventually thirty or more units in various cities. It was not, of course, until the period of large membership that the enormous sums of money above mentioned, were obtained. However, as far as the record shows, the course of conduct of the appellants' group, from the formative period of the Club in the latter part of 1927 and 1928 down to the indictments, remained the same, namely, to promote and operate an organization similar to the Decimo Club and carry out the purposes which Monjar "always had had in mind." There is nothing even attempted on the part of the appellants to show that at some stage after 1928 they ever had any different aims in the functioning of the Club. The unchanging purposes of Monjar as shown by the end results were to defraud the members of the Mantle Club to the benefit of himself and his associates. It therefore seems to us that the jury was entitled to conclude from the evidence, as it did, that the fraudulent scheme was devised prior to the organization of the Mantle Club in 1928.

The defendants, J. F. Jones, Mrs. Monjar, Moore, Lindh, Fitzpatrick, Willard, Candlin and Cruser, are in no substantially different position than the other defendants in the case. There was ample evidence that all of them participated in varying degrees in the smug sanctimonious fraud disclosed by the proofs and that evidence fully justified the conviction of Jones under all of the counts of the first indictment which were left to the jury, Mrs. Monjar of the conspiracy count in the first

indictment and the others under the single conspiracy count of the second indictment.

■ A reading of the record shows that there was no harmful error in the opening statement of the United States attorney. This had to do with investigations of the Mantle Club in other cities. Its purpose was limited to show knowledge of the defendants to the second indictment of the existence of the personal loans and of the circumstances surrounding the case generally. It was specifically stated that the government was not relying on such investigations to prove the instant indictments. The trial court, on objection by the defense, immediately ruled "that evidence of investigations in other jurisdictions has nothing to do with this case." Following that, counsel for the defense requested an exception to the United States attorney's remarks. The court said: "Your position is that you think it is prejudicial to the jury even though the court has admonished the jury to ignore these remarks." Counsel pressed the point and the court said, "All right, let an exception be noted for what it is worth." Defense counsel then asked an exception to that language.

It seems to us that the trial judge acted promptly and fairly. Right at the start of this sixty-three day trial he eliminated what he considered irrelevant matter presented by the government and at the same time he protected the rights of the defendants in the situation arising therefrom.

■ The appellants further object to the court announcing on the twenty-first day of the trial that the defendants could not leave the district without the consent of the court and that if the defendants did not cooperate their bail would be revoked. This was occasioned by one of the defendants returning to his home in New York over the previous week-end and not appearing in court the following Monday. The judge said to the jury in connection with this: "Now I don't want you to be misled by my remarks. These defendants come into this court room clothed with the presumption of innocence until the government proves them guilty. Simply because I was trying to work out a mechanical problem of seeing that this case gets along without delay don't interpret my remarks as indicating or implying that on my part I have withdrawn from that presumption which these defendants still enjoy."

Here again the court disposed of an important trial problem expeditiously and with entire fairness to the defendants.

■ The appellants argue that the reception into evidence of the sworn statements of some of the appellants made to an Internal Revenue Agent was error because (a) this was contrary to Treasury Regulations; (b) it violated a promise to the appellants and (c) it compelled the appellants to be witnesses against themselves in violation of the Fifth Amendment.

The agent testified with the consent of the Treasury Department subject to the one limitation, that he acquaint the Court with the circumstances under which the statements were made to him, and this he did. Our attention has not been called to any Treasury Regulation prohibiting the testimony as given. The only promise made by the agent to the appellants was that he would not cooperate with the Securities and Exchange Commission investigation then in progress. The agent testified that he kept that promise. As to the constitutional point, there is overwhelming proof in the record that the statements were voluntary. We have also examined the Trial Court's admonition to the jury when the statements were received into evidence. There was no objection to this at the time, nor was there any request later of the Court to charge specifically concerning them. We find no material error by the Court in connection with the statements in question.

A study of the remainder of appellants' points, consisting of alleged errors in the admission of evidence and a single exception to the charge of the court, reveal them to be without merit.

■ From an exhaustive examination of the entire record in this case we are satisfied that the guilt of the appellants was clearly proved and that no errors appear which substantially prejudiced the appellants. It follows under Section 269 of the Judicial Code as amended, 28 U.S.C. § 391, 28 U.S.C.A. § 391, that the judgments appealed from must be affirmed. Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314; Jarvis v. United States, 1 Cir., 90 F.2d 243 certiorari denied 302 U.S. 705, 58 S.Ct. 25, 82 L.Ed. 544; Stokes v. United States, 5 Cir., 93 F.2d 744, certiorari denied 304 U.S. 558, 58 S.Ct. 945, 82 L.Ed. 1525.

The judgments of the District Court are affirmed.