STATE of Missouri, Respondent,

v.

Lewis Farnch HARVEY, Appellant.

No. 61623.

Supreme Court of Missouri,
Division No. 1.

Dec. 15, 1980.

Rehearing Denied Jan. 13, 1981.

**420**

David M. Strauss, Columbia, for appellant.

Edward F. Downey, Asst. Atty. Gen., Jefferson City, for respondent.

WELBORN, Commissioner.

Appeal from judgment and sentence to life imprisonment for murder in first degree, entered upon jury verdict.

At around 7:00 P.M., September 3, 1978, the body of Della Morlock was discovered in her room at the Everyday People's House in Columbia. She had died from a small caliber gunshot wound to the head. She had been dead some time when her body was discovered.

At around 4:00 P.M., September 10, 1978, Bob Harvey called Columbia police and told them that he believed that his son, Lewis Harvey, the appellant, had stolen his pistol. The father asked that the son be arrested. Police went to the Harvey residence, found Lewis there, and at their request he went with the officers to police headquarters.

There either Officer Ward or Sergeant Duncan read a *Miranda* warning to Lewis and at 4:23 he signed a copy of the warning, acknowledging that he had been advised of his rights. The officers told Lewis that his father wanted him arrested for stealing his gun. Lewis denied that he had taken the weapon. After repeating his denial several times, Lewis was told by the officers that if he would tell them where the gun was, he would not be arrested for stealing it. Lewis then told the officers where it was. Sergeant Duncan went to where Lewis said the gun was and found a .22 caliber pistol. He returned with the pistol to police headquarters.

Before Sergeant Duncan went for the gun, Lewis told the officers that he thought he should tell them that the gun had been fired. He said that when he was leaving his father's house, he tripped over a fence and the gun accidentally discharged. When Sergeant Duncan returned with the gun which was loaded and had one spent cartridge, Lewis said that his first story was not really how the gun had been fired. He said that he was walking along with the gun in his trousers and it fell down and got caught in his underwear and became cocked. He didn't know how to let the hammer down without firing the weapon. He removed the weapon from his trousers, looked around and seeing no one, fired it into the air.

At approximately 6:00 P.M., the officers, who had, in response to an earlier inquiry by Lewis as to whether they had found the weapon used to kill Morlock, told Lewis that their inquiries did not relate to that case, conferred with each other and decided

to question him about the Morlock case. They did not expressly so inform Lewis, but began by asking whether or not he had been to Everyday People's and whether he knew Della Morlock. At first Lewis denied that he knew Morlock. Upon further questioning, he said that he knew a girl named Della and that she invited him to visit her at Everyday People's and he went there. At first he denied that he had a pistol when he went there. Eventually, he admitted that he had the pistol but denied that it had been fired at Everyday People's. Finally, he admitted that the weapon had been fired in Della's room. His final version of the events was that he had removed his clothing in Della's room to have sexual intercourse at her request. He put the pistol under his clothes and, after having intercourse, was putting on his trousers when he tripped and fell. As he fell, he dropped the pistol and it fired. Della screamed, but he thought that he had just scared her and he put on his trousers and left.

Lewis's statement that the gun had fired in Della's room was made at about 7:50. Shortly thereafter, a break was taken in the questioning and food was provided Lewis.

At around 9:30, Sergeant Duncan began writing down the final version of events as Lewis repeated it to him. It took about an hour to do this and at its conclusion, Duncan gave his handwritten copy to a stenographer who copied it by typewriter on a form which included a *Miranda* warning. The typed copy was read by Lewis and signed by him at approximately 11:28.

Inasmuch as the issues on this appeal relate to the admissibility of Lewis's statement informing the police of the whereabouts of the gun and the subsequent typed statement signed by him, there is no need to detail the evidence from which the jury found that Morlock was shot by appellant in the commission of rape.

Motions to suppress both statements were filed and a hearing held on them. The motions were overruled. The defendant repeated his objections at trial, they were preserved in the motion for new trial and provide the basis for the appeal here.

With respect to the statement telling the police of the gun's whereabouts, appellant contends that his statement was involuntarily given because it was induced by promises of leniency from the police.

Appellant invokes the language in *Bram v. United States*, 168 U.S. 532, 542, 18 S.Ct. 183, 186–187, 42 L.Ed. 568 (1897):

> "* * * [A] confession, in order to be admissible, must be free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence ... A confession can never be received in evidence where the prisoner has been influenced by any threat or promise; for the law cannot measure the force of the influence used, or decide upon its effect upon the mind of the prisoner, and therefore excludes the declaration if any degree of influence has been exerted."

He also cites numerous cases in federal and state courts in which confessions or statements of a defendant have been found involuntary because of promises of leniency or mental coercion. However, with the exception of *United States v. Denno*, 259 F.Supp. 784 (S.D.N.Y. 1966), none of the cases relied upon presented a factual situation in which the promises or mental coercion were related to one offense and the statement adduced was eventually sought to be employed in prosecution for a different offense. In *Denno*, the defendant was told that his cooperation was sought as a witness against another defendant in a murder case and that if he would give the officers a statement, he would not be prosecuted for any offense arising from the homicide. The statement was given, but the maker refused to cooperate in the prosecution of the other defendant. Later the statement was used against its maker in a prosecution as an accessory to a felony and for criminally possessing a pistol.

The court, in *Denno*, held that the use of the statement violated the defendant's privilege against self–incrimination and should

have been barred from evidence. "The defendant's incriminating statement was secured in an atmosphere of inducement created by the detective's promise." 259 F.Supp. 791.

In *Denno*, the prosecution argued that the only promise made to the defendant was not to prosecute him for murder and that such promise was kept and therefore the statement should not be held involuntary. The court rejected the argument, pointing out "* * * the context and broad sweep of all the detective's assurances to petitioner." Id.

There is no contention in this case that the assurance of nonprosecution given by the officers related to other than the possible charge of stealing the weapon. Nor is there any challenge to the testimony of the officers that at the time the assurance was given, they were seeking the appellant's cooperation only with regard to that offense. This circumstance distinguishes this case from those cited by appellant in which, although the promise or assurance related to other offenses, the statement was sought with respect to a given offense there under investigation by the officers and was subsequently offered in a prosecution for such offense. *Grades v. Boles*, 398 F.2d 409 (4th Cir. 1968), *State v. Duran*, 127 Mont. 233, 259 P.2d 1051, 1052–1054[4] (1953), and *State v. Tardiff*, 374 A.2d 598 (Me. 1977), cited by appellant, are examples of such situation. Those cases cite the general principles relied upon by appellant, but they are of little assistance in the application of those principles in the circumstances of this case.

*United States v. Monjar*, 147 F.2d 916 (3rd Cir. 1944), involved a situation more nearly analogous to that of the present case. In *Monjar*, an internal revenue agent obtained sworn statements from persons involved in a fraudulent securities scheme, based upon the promise by the agent of noncooperation with the Securities and Exchange Commission investigation. Upon trial of the defendants for mail fraud, based upon the securities scheme, the statements of the defendants to the internal revenue agent were used against the defendants. In response to the contention that the statements were invalid because they had been given in reliance upon the promise of the IRS agent and violated the defendants' Fifth Amendment rights, the court stated (147 F.2d 924 [10, 11]):

> "* * * The only promise made by the agent to the appellants was that he would not cooperate with the Securities and Exchange Commission investigation then in progress. The agent testified that he kept that promise. As to the constitutional point, there is overwhelming proof in the record that the statements were voluntary."

All of the evidence in this case is that the appellant's statement was voluntarily made. The appellant did not testify on the motion to suppress or at the trial. The testimony of the officers was that the information was given upon brief questioning. Insofar as the record shows, appellant volunteered the information that the gun had been fired and his subsequent change in that story which for the first time aroused the officers' suspicion that he might have been involved in Morlock's death.

Thus, as in *Monjar*, the only promise made to the appellant was kept and all of the evidence was that the statement was voluntary.

There appears to be a dearth of authority on the precise question here presented. In *State v. Williamson*, 339 Mo. 1038, 99 S.W.2d 76, 79[6] (1936), in discussing the nature of promises of "worldly advantage" which render a confession inadmissible, the court stated that the promises "* * * must have reference to the accused's escape from punishment, or to the mitigation of his punishment, *for the crime charged*, and not offer merely an opportunity for the gratification of his personal desires, or for his greater comfort, or for the granting of a benefit to some third person." Obviously the statement that the promise must relate to the crime charged was not made in the context of the situation of this case.

Text writers cite a single case in support of the pronouncement that the promise

must relate to the charge against the accused for which he is being prosecuted. 29 Am.Jur.2d Evidence, § 559, p. 618 (1967), and 3 Wigmore on Evidence, § 836, fn. 1, p. 474 (Chadbourne Rev. 1970) cite only *State v. Fortner*, 43 Iowa 494 (1876), in support of such text statement.

■ Slight though the authority may be, it would favor the admissibility of the statement here involved. As pointed out in *United States v. Ferrara*, 377 F.2d 16, 17 (2d Cir. 1967), the *Bram* statement relied upon by appellant has not been applied with "wooden literalness." The test is whether or not the defendant's will was overborne by the law enforcement officers, resulting in a confession or statement, not freely self–determined.

■ In this case, the officers dealt honestly with appellant. Their promise to him was not made in an effort to procure a statement to be used in a criminal prosecution but to resolve what appeared at that time to be only a family dispute. The defendant offered no testimony that his will was overborne. Under all of the circumstances, the trial court did not err in concluding that for the purpose of this proceeding, the statement was voluntary.

■ Resolution of this question eliminates appellant's second contention that his statement regarding the incident at Morlock's room was the "fruit of the poisoned tree," represented by his statement regarding the gun. Having found that statement admissible, the basic premise of the objection must fail.

■ Appellant further contends that his statement which was reduced to writing should not have been admitted because it was not prefaced by any reading or waiver of *Miranda* rights. His position is that when, following the statement about the gun and its discovery, the police began to question him as a suspect in the Morlock murder, the officers should have repeated the *Miranda* warning which had been given less than two hours before, when the questioning about the gun began. In *State v. Woodward*, 587 S.W.2d 287, 289[1–3] (Mo.

App. 1979), the defendant received *Miranda* warnings and was questioned about the charge for which he was under arrest. The questioning produced no response. Some two hours later, the defendant was again questioned. *Miranda* warnings were not repeated. In rejecting the contention that such warnings were required prior to the second questioning, the court stated:

"* * * Further, with regard to the second interrogation, *Miranda* warnings need not be given each time the accused is questioned. *Miller v. United States*, 396 F.2d 492 [495–496[3]] (8th Cir. 1968), cert. den., 393 U.S. 1031 [89 S.Ct. 643, 21 L.Ed.2d 574] * * * (1969)."

That holding answers the objection here raised.

Judgment affirmed.

PER CURIAM:

The foregoing opinion by WELBORN, C., is adopted as the opinion of the court.

All of the Judges concur.