STATE of Missouri,
Plaintiff-Respondent,

v.

Marvin STOKES, Defendant-Appellant.

No. 49464.

Missouri Court of Appeals,
Eastern District,
Division Three.

April 22, 1986.

Motion for Rehearing and/or Transfer Denied May 20, 1986.

Application to Transfer Denied June 17, 1986.

George Peach, St. Louis, William L. Webster, Atty. Gen., Christine M. Szaj, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

Henry Robertson, St. Louis, for defendant-appellant.

SIMON, Judge.

Defendant, Marvin Stokes, appeals from a conviction of second degree murder. Section 565.004, RSMo 1978. Following a jury verdict in the Circuit Court of the City of St. Louis, the defendant was sentenced to a prison term of fifteen years.

On appeal, the defendant contends the trial court erred in: (1) overruling his motion to suppress his taped statement because (a) it was made while he was in custody pursuant to a warrantless arrest not based upon probable cause, and (b) it was induced by hope of immunity from prosecution and punishment; (2) overruling his motion for a mistrial when a witness unresponsively provided an answer which was hearsay upon hearsay. We affirm.

Defendant does not contest the sufficiency of evidence, therefore, the relevant facts of the case will be presented upon consideration of the defendant's points.

Defendant's first point relates to the trial court's refusal to suppress his taped statement. The defendant argues that the statement was made while he was unlawfully under arrest, since no probable cause existed to arrest him.

■ The lawfulness of a warrantless arrest turns on whether the police officers acted with probable cause. *State v. Garrett*, 627 S.W.2d 635, 641 (Mo. banc 1982). Whether the police had probable cause or not is determined by examining the information possessed by the officers prior to the arrest and all reasonable inferences which can be drawn therefrom. *State v. Wiley*, 522 S.W.2d 281, 287 (Mo. banc 1975). Whether such information constitutes probable cause is determined by whether a reasonably prudent and cautious person would believe that the suspect has committed an offense. *State v. Heitman*, 589 S.W.2d 249, 253 (Mo. banc 1979), *cert.* denied, 446 U.S. 941, 100 S.Ct. 2164, 64 L.Ed. 795 (1980). The probable cause determination rests upon the particular facts and circumstances of the individual case and no "litmus paper test" can be applied. Hearsay may be considered, however it must have some inherent credibility upon which a reasonably prudent and cautious person would act. *State v. Jackson*, 658 S.W.2d 54, 56 (Mo.App.1983). The practical considerations of everyday life on which a reasonably prudent person acts, not the hindsight of legal technicians govern the probable cause determination. *Wiley*, 522 S.W.2d at 287.

■ The standard of review of a trial court's ruling on a motion to suppress evidence was set forth by our Supreme Court in *State v. Blair*, 691 S.W.2d 259 (Mo. banc 1985). The reviewing court is free to disregard contrary evidence and inferences, and is to affirm the trial court's ruling on a motion to suppress if the evidence is sufficient to sustain its finding. *Blair*, 691 S.W.2d at 260. The *Blair* court reviewed a trial court's ruling on a motion to suppress evidence gained as the result of an arrest which was a pretext to search for evidence of another offense. The constitutional values at stake in *Blair* are not sufficiently distinguishable from those at stake in the case at bar to merit a different standard of review.

Kathy Bruce was interviewed as part of the investigation of Conrad Daugherty's murder. Kathy Bruce was the girl friend of Conrad Daugherty, and is also the cousin of the defendant, Marvin Stokes. Kathy

Bruce told the police that as Conrad Daugherty was dying he named the person who shot him. At first she said that person was Derick Bridget or Bridges, who was arrested, but later released. When she was again questioned about Conrad Daugherty's dying declaration, she admitted that she had lied to the police during the first interview. She said she had lied in order to protect the person Conrad Daugherty actually named since that person was her cousin, Marvin Stokes.

■ In his brief defendant characterizes Kathy Bruce as an informant and cites cases accordingly. We do not so characterize Kathy Bruce. "As we understand the term, persons who supply information only after being interviewed by police officers, or who give information as witnesses during the course of an investigation, are not informers." *Gordon v. United States*, 438 F.2d 858, 875 (5th Cir.1971) *cert.* denied, 404 U.S. 828, 92 S.Ct. 140, 30 L.Ed.2d 56 (1971) quoted in *United States v. Oliver*, 570 F.2d 397, 401 (1st Cir.1978). The cases cited by appellant which refer to the reliability of informants are inapposite.

■ Standing alone, Kathy Bruce's subsequent identification of Marvin Stokes as the person named by Conrad Daugherty in his dying declaration may not have provided a police officer with probable cause to arrest Marvin Stokes. Although her explanation of the reason why she initially lied to the police was plausible, it would not by itself provide a sufficient foundation for believing her second interview. Logically, no more reason existed for reaching the conclusion that Kathy Bruce was now telling the truth as to conclude she had created another layer of deceit to protect a true party in interest. However, the information available to the police was not limited to what Kathy Bruce had told them. Even though any one piece of information, while standing alone may not furnish probable cause, when viewed with other pieces each piece may increase in significance and relevance, and together rise to the level of probable cause.

The police knew of an anonymous phone call which connected defendant with the shooting of Conrad Daugherty, but the most probative information was supplied by the defendant.

On March 6, 1984 the defendant called the police station and spoke with Officer Bates. He said he knew that the police were looking for him. He agreed to come down to the police station and "turn himself in" between 9:00 and 9:30 a.m. on March 7, 1984, after he located Conrad Daugherty's gun. When the defendant did not present himself at the police station, as agreed, the police proceeded to arrest Marvin Stokes.

This evidence, taken together, forms a sufficient basis upon which the trial court could rule that the police had probable cause to arrest Marvin Stokes.

■ Defendant stresses that Officer Hendricks, one of the arresting officers, felt that without a statement by Marvin Stokes, a warrant for his arrest could not be obtained. An officer's subjective belief is not controlling on the question of probable cause. The facts supplying probable cause to arrest were present independently of Officer Hendricks' subjective belief and his personal assessment is of no real moment. *Heitman*, 589 S.W.2d at 254.

Additionally, defendant contends that the trial court erred in not suppressing his taped statement because it was induced by a promise of immunity from or leniency in prosecution and/or punishment, and therefore was involuntary.

■ The rule is clear. Involuntary confessions are not admissible into evidence. "The test for 'voluntariness' is whether the totality of circumstances deprived the defendant of a free choice to admit, to deny, or to refuse to answer, and whether physical and psychological coercion was of such a degree that defendant's will was overborne at the time he confessed." *State v. Higgins*, 592 S.W.2d 151, 158 (Mo. banc 1979), appeal dismissed, 446 U.S. 902, 100 S.Ct. 1825, 64 L.Ed.2d 254 (1980). Although there is no single test for judging

the voluntariness of a suspect's statement, a number of factors are relevant in making this determination. The age, experience, intelligence of the accused should be considered as well as his education, and any infirmity, or unusual susceptibility to coercion. *State v. Flowers*, 592 S.W.2d 167, 169 (Mo. banc 1979).

"A confession, in order to be admissible, must be free and voluntary: that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *Bram v. United States*, 168 U.S. 532, 542–43, 18 S.Ct. 183, 187, 42 L.Ed. 568, 573 (1897) quoted in *State v. Hughes*, 596 S.W.2d 723, 726 (Mo. banc 1980). However, the language in *Bram* in which a confession obtained by any direct or indirect promise, however slight, is defined *a priori* as involuntary has never been applied with wooden literalness. *State v. Harvey*, 609 S.W.2d 419, 423 (Mo.1980) citing *United States v. Ferrara*, 377 F.2d 16, 17 (2nd Cir.1967), cert. denied, 389 U.S. 908, 88 S.Ct. 225, 19 L.Ed.2d 225 (1967).

"While the *Bram* test has long been followed, it has not been applied on a strict, *per se* basis. [Citations omitted.] Rather, determinations of voluntariness are based upon an assessment of all the circumstances and factors surrounding the occurrence when the statement is made." *United States v. Grant*, 622 F.2d 308, 316 (8th Cir.1980); *See also Rachlin v. United States*, 723 F.2d 1373, 1377 (8th Cir.1983).

■ If promises, direct or implied, however slight, are made to a defendant by police officers during interrogation, the statement given by the defendant is not *per se* involuntary and therefore inadmissible. All the circumstances surrounding the statement must be considered in determining if the defendant's will was overborne by the promise. The nature of the promise must be considered. It must be positive in its terms and clear in its implications. *State v. Unhahn*, 621 S.W.2d 928, 932 (Mo. App.1981). The promise must directly relate to the crime charged. *State v. Har-*

*vey*, 609 S.W.2d 419, 422 (Mo.1980). It must be made by one in authority to deliver. *State v. Hoopes*, 534 S.W.2d 26, 35 (Mo. banc 1976). Of significance are any measures taken by the police to correct any false hopes for immunity or leniency arising from an implied promise mistakenly or imprudently made during the heat of an interrogation. Whether the defendant proceeded in making his statement prior to any curative measures taken by the police is of cardinal importance. In short, whether a statement is admissible hinges on its voluntariness in light of the totality of the circumstances, not on whether a promise was made. *State v. Harvey*, 609 S.W.2d 419, 423 (Mo.1980); *State v. Hutson*, 537 S.W.2d 809, 813 (Mo.App.1976).

The totality of circumstances method of analyzing the voluntariness of a defendant's statement which we employ herein is limited to those cases in which a determination must be made as to whether a unilateral promise made by the police or prosecutor during a custodial interrogation was an inducement which so overburdened a defendant's will so as to render involuntary any statement subsequently given.

■ When a criminal defendant alleges that his inculpatory statements are not admissible because involuntarily made, the state bears the burden of proving the voluntariness of the confession. *State v. Hughes*, 596 S.W.2d 723, 726 (Mo. banc 1980). A confession is admissible if the state proves by a preponderance of the evidence that it was voluntary. *Hughes*, 596 S.W.2d at 726.

■ The standard of review by an appellate court of a trial court's ruling on the voluntariness of a defendant's confession was set forth in *State v. Alewine*, 474 S.W.2d 848, 852 (Mo.1971). The trial court must determine in the first instance the voluntariness of the defendant's statement. The credibility of witnesses and conflicts in evidence are for resolution by the trial court. On appeal, the question is whether the evidence was sufficient to sustain the trial court's finding that the statement was

voluntarily or involuntarily made. *Alewine,* 474 S.W.2d at 852.

When the defendant was arrested, Officer Massey advised him of his constitutional rights. He was then transported to police headquarters where he was placed in an interview room. Fifteen to twenty minutes later Officers Massey, Bates and Hendricks entered the room. While Officer Bates advised the defendant of his constitutional rights, the defendant read from his own *Miranda* warning card which he had in his wallet. The defendant said that he understood his rights and agreed to make a statement. He denied having any knowledge of the circumstances surrounding the death of Conrad Daugherty. The defendant was then told that others had implicated him in the crime and that the officers would like to get his version of what happened. The defendant then agreed to tell the truth, and proceeded to describe the events which transpired between himself and Conrad Daugherty the night before Daugherty was killed. This portion of the interview was not recorded. At a certain point during the interview the defendant was asked if he would commit his statement to tape. In order to encourage the defendant to put his statement on tape, Officer Hendricks told him that others had come forward with their version of the incident; that the officers would like to get his version of what happened. Officer Hendricks also encouraged the defendant to put his statement on tape by informing him that "that telling us what happened wouldn't hurt him."

The transcript of Officer Hendricks' cross-examination regarding his statement, "telling us what happened wouldn't hurt him," does not clearly reveal at what point during the interrogation it was made. The defendant on direct examination during the motion to suppress his statement testified that Officer Hendricks' remark was made just prior to the tape recording of the defendant's statement. Consequently, the defendant had already proceeded in giving his statement before Officer Hendricks' remark. The defendant's taped statement was preceded by an oral statement during which he was interrupted with a request that he commit it to audio tape.

After the defendant was interrupted, he stopped giving his statement. He agreed to place his statement on tape and signed a waiver form. The tape recorder was then activated and for a third time the defendant was informed of his rights. He was asked if he understood his rights, and specifically if he understood that what he would say could be used against him in a court of law.

Officer Hendricks' statement informing the defendant that what he would say would not hurt him is what the *Bram* Court described as "an implied promise, however slight." *Bram,* 168 U.S. at 543, 18 S.Ct. at 187, 42 L.Ed.2d at 573. The implication of Hendricks' statement from the perspective of a defendant under interrogation is clear. The message, although an implied one, was not opaque; if you make a statement on audio tape, your legal interests will not be adversely affected.

A promise to a defendant in custody does not *per se* make any statement he gives thereafter involuntary. *United States v. Grant,* 622 F.2d 308, 316 (8th Cir.1980). The issue of voluntariness is not resolved by labeling what a police officer said as a promise or not a promise, but by an analysis the "totality of the circumstances." The test is: considering all the circumstances, was *this* defendant's will, given *these* interrogation tactics, overborne? *State v. Harvey,* 609 S.W.2d 419, 423 (Mo. 1980); *State v. Hutson,* 537 S.W.2d 809, 813 (Mo.App.1976). Consideration must be given to the age, experience and education of the defendant plus any special conditions brought to the trial court's attention. *Flowers,* 592 S.W.2d at 169. All the details of the interrogation must also be examined.

The defendant was nineteen years of age and had completed the eleventh grade. No evidence was presented to the trial court that the defendant was of less than normal intelligence. The defendant was sufficiently equipped with experience and intelligence to grasp the meaning of the warn-

ings he was given and to understand the consequences of his actions.

The defendant was making a statement prior to the Officer Hendricks' statement. The officer's promise did not induce the making of a statement as such, but rather, the commitment of it to audio tape. In the suppression hearing, the defendant said fear was the reason he made the statement.

Of particular significance is the termination of interrogation after Officer Hendricks' statement. The defendant did not continue making his statement. He was given a third set of *Miranda* warnings and examined as to his understanding of them. Further, the defendant acknowledged that he understood that what he stated on audio tape could be used against him in a court of law. No evidence was presented at trial which would lead to the contention argued on appeal that the defendant persisted in believing that if he made a statement on audio tape it could not be used against him in spite of direct warnings that it could be.

The defendant was not unfamiliar with the workings of the criminal justice system. He had been arrested and charged for two related offenses in January, 1983. He brought a *Miranda* warning card with him to the police station when he was arrested. Prior experience with the criminal justice system is relevant as to the extent to which police custody and interrogation affect the psychological interplay of emotion and will.

Under this particular factual situation, we conclude that the trial court's ruling that the defendant's statement was voluntary, in light of the totality of the circumstances, has sufficient evidentiary support.

█ In his second point, defendant contends that the trial court erred in not granting his request for a mistrial to remedy Officer Massey's unresponsive, hearsay on hearsay answer on cross-examination. Actually, the answer was hearsay upon hearsay upon hearsay. Conrad Daugherty's dying declaration was given to Kathy Bruce, who in turn told Officers Bates and Hendricks who in turn informed Officer Massey.

During Officer Massey's cross-examination on the source of Kathy Bruce's knowledge that the defendant murdered Conrad Daugherty, the following transpired:

Q. Who was the witness.

A. A young lady by the name of Kathy Bruce.

Q. But as far as your understanding, this witness never actually witnessed what happened?

A. No.

Q. She just had information from the neighborhood?

A. No—well, she had went [sic] to the scene of the shooting and was told by the victim.

The line of questioning is aimed at the source of Kathy Bruce's knowledge. Given the general area of questioning, and especially the open-ended question, "She just had information from the neighborhood?," we cannot say that Officer Massey's answer was unresponsive. The defendant was inquiring as the source of Kathy Bruce's knowledge and got an answer.

It is axiomatic that a defendant may not take advantage of self invited error. *Richardson v. State*, 617 S.W.2d 76, 77 (Mo. App.1981).

Affirmed.

KAROHL, P.J., and GARY M. GAERTNER, J., concur.