**STATE of Missouri, Respondent,**

v.

**Nicholas R. TETTAMBLE, Appellant.**

**No. 15256.**

Missouri Court of Appeals,
Southern District,
Division One.

March 10, 1988.

Sidney T. Pearson, III, Sp. Asst. Public Defender, St. James, for appellant.

William L. Webster, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Chief Judge.

Nicholas R. Tettamble ("defendant"), tried as a prior offender, § 558.016.2, RSMo Cum.Supp.1984, and a persistent offender, § 558.016.3, RSMo Cum.Supp.1984, was found guilty by a jury of the class B felony of burglary in the first degree, § 569.160, RSMo 1978, and sentenced by the trial court to 30 years' imprisonment. Defendant appeals, averring that (1) his in-court identification by the sole eyewitness should have been suppressed, and (2) the trial court wrongly denied defendant's day-of-trial motion for a continuance.

The verdict was returned March 23, 1987. Immediately after the jury was discharged, defendant's attorney requested "the full twenty-five days" to file a motion for a new trial. The trial court stated: "The one hundred seventh day is Friday the 17th, Good Friday, and for that reason this Court is going to grant the defendant until Monday, April 20th to file his after trial motions."

Defendant's attorney filed a motion for new trial on April 20, 1987, and defendant filed sundry pro se motions that date.

Rule 29.11(b)[1] provides:

"A motion for a new trial ... shall be filed within fifteen days after the return of the verdict. On application of the defendant made within fifteen days after the return of the verdict and for good cause shown the court may extend the time for filing of such motions for one additional period not to exceed ten days."

Rule 20.01(a) provides:

"In computing any period of time prescribed or allowed by these Rules, ... the day of the act, event, or default after which the designated period of time begins to run is not to be included. The last day of the period so computed is to be included, unless it is a Saturday, Sunday, or a legal holiday...."

The trial court was without authority under the above rules to extend the deadline for filing defendant's motion for new trial beyond April 17, 1987 (the twenty-fifth day after the return of the verdict), unless such date was a Saturday, Sunday, or legal holiday. Friday, April 17, 1987, was neither a Saturday, Sunday, or legal holiday.[2]

■ A trial court is not empowered to waive or extend the time to file a motion for new trial beyond that authorized by Rule 29.11(b), and a motion filed beyond the time the rule allows preserves nothing for appellate review. *State v. Vedder*, 668 S.W.2d 639, 640[1, 2] (Mo.App.1984); *State v. Bailey*, 645 S.W.2d 211, 212[1] (Mo.App. 1983). We shall therefore consider whether the matters complained of in defendant's brief resulted in manifest injustice or a miscarriage of justice warranting plain error relief under Rule 29.12(b). *State v. Sonka*, 693 S.W.2d 215, 216[2, 3] (Mo.App. 1985); *Bailey*, 645 S.W.2d at 212[2]. We summarize only the evidence essential for that purpose.

On Saturday, October 5, 1985, Lester Ruble, Jr., was in a field at his parents' farm in Iron County.[3] He saw a station wagon drive up to his parents' house and stop. A man got out. Ruble went to the house. The man, identified as defendant by Ruble at trial, asked how to get to Annapolis. A three or four minute conversation ensued, during which Ruble and defendant were two or three feet apart.

Ruble observed a second man in the passenger seat of the station wagon, and a third man in the back seat. Ruble had never seen defendant or the other men before. As the station wagon departed, defendant driving, Ruble noticed it went the opposite way he had directed.

Ruble, who was at the house alone, entered and went upstairs. About 15 minutes later he looked out a window and saw the same station wagon pull into the driveway. Defendant got out, came to the house, and knocked on the front door. Ruble did not answer. Defendant then went to the back door and knocked. Again Ruble did not answer. Ruble then saw defendant kick in the back door and heard defendant walk through a hallway inside the house. Ruble, who was in a bedroom, locked the bedroom door, climbed out a window, made his way to his father's truck behind the house, and drove to the home of Iron County Deputy Sheriff Donnie Ivy a few miles away to report the incident.

Ivy went to the Ruble residence and observed that the storm door was torn off and the back door was kicked in. Ruble gave Ivy a description of the station wagon and its three occupants. Asked at trial about his descriptions of the men, Ruble recalled describing defendant as probably six feet tall, with brown hair and a thinning hairline. Ruble described the man in the front passenger seat as around 24 years old with a large build, short dark brown hair and a mustache. He looked like he had not shaved in a few days. The man in

1. Rule references are to Missouri Rules of Criminal Procedure (18th ed. 1987).

2. Section 9.010, RSMo 1986, declares and establishes 12 public holidays. None are in April.

3. The case was tried in Dent County on change of venue.

the back seat appeared to be around 20 years old, and had long blond hair.

Ivy recalled seeing a similar station wagon drive slowly past his home the day of the break-in, a short time before it occurred. The station wagon had passed within 20 feet of Ivy as he waited in his driveway to turn onto the road. Ivy saw the driver and two passengers. At trial, Ivy identified defendant as the driver.

Ruble's descriptions of the station wagon and its occupants were dispatched by Ivy to surrounding counties. A few hours later, Ivy was called to a location in Madison County, 35–40 miles from the Ruble residence. There, he saw the station wagon "broke down on the road" and two men in custody of law enforcement officers. The men matched Ruble's general description of the two passengers in the station wagon. Ivy arrested the duo (William Pratt and Clyde Staples) for the Ruble burglary. At the Iron County Sheriff's office the next morning, Ruble identified Pratt and Staples as two of the culprits.

Defendant was arrested in St. Louis within a week after the break-in. Two or three days after defendant's arrest, Ivy obtained photographs of the three arrestees and gave them to Ruble's father, Lester Cicero Ruble. Ivy recalled, "I told Mr. Ruble that these are the three that we had arrested, to take these pictures to Lester Ruble, Jr. and see if he could identify them." Ivy gave the elder Ruble no photograph of anyone else.

The elder Ruble took the photos to the State Bank of Greenville, where Lester, Jr., was employed as assistant cashier. The elder Ruble asked Lester, Jr., whether the photographs were "the boys that was up at the house." Lester, Jr., told his father they were the ones.

Prior to trial, defendant filed a motion to suppress any in-court identification of him by Lester, Jr. At a hearing on the motion, Lester, Jr., was asked whether his father, upon delivering the photographs, had stated: "These are the three that did the burglary." Lester, Jr., conceded his father could have said that, but that he (Lester, Jr.) did not remember.

The elder Ruble, testifying at the suppression hearing, denied telling his son that the photographs were of the three men who did the burglary.

At trial, Lester, Jr., again testified that his father, upon displaying the photographs, could have said they "were the three that did it," but that he (Lester, Jr.) did not remember.

The elder Ruble, testifying at trial, recalled that when Ivy furnished the photographs, Ivy said, "[T]hese are the ones that did it." Then, this:

"Q. Did you take those photographs to your son?

A. Yes.

Q. And did you give him that message?

A. Yes."

Defendant's first assignment of error maintains his in-court identification by Lester, Jr., was impermissibly tainted by "improper out-of-court identification procedures" in that Ivy utilized a "highly suggestive" photographic lineup procedure to influence Lester, Jr. Defendant complains that (a) no photographs of anyone except the three arrestees were shown to Lester, Jr., and (b) Lester, Jr., was told by his father that the photographs were of the men who committed the burglary. Defendant cites *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), where the accused contended that his pretrial identification by means of photographs was made under circumstances so unnecessarily suggestive and conducive to misidentification as to deny him due process of law. 390 U.S. 381, 88 S.Ct. 970. *Simmons* held that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. 390 U.S. at 384, 88 S.Ct. at 971[3].

■ The subject was explored further in *Manson v. Brathwaite*, 432 U.S. 98, 97

S.Ct. 2243, 53 L.Ed.2d 140 (1977). There, an undercover police officer purchased narcotics from a man he did not know. The officer later described the seller to another officer, who surmised from the description that the seller was one Brathwaite. The latter officer obtained a photograph of Brathwaite from police records and left it at the office of the officer who had made the purchase. That officer, alone, viewed the photograph two days after the purchase, and determined that the person shown in the photograph was the seller. At Brathwaite's trial, the officer—who had not seen Brathwaite in the eight months since the sale—testified he had no doubt that the person in the photograph was Brathwaite, and the officer made a positive in-court identification of Brathwaite as the seller. Rejecting Brathwaite's contention that the admission of the identification testimony deprived him of due process of law, the Supreme Court held that reliability is the linchpin in determining the admissibility of identification testimony in such instances. 432 U.S. at 114, 97 S.Ct. at 2253[3]. The factors to be considered include (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of his prior description of the criminal, (4) the level of certainty demonstrated at the confrontation, and (5) the time between the crime and the confrontation. 432 U.S. at 114, 97 S.Ct. at 2253[4]. Against these factors is to be weighed the corrupting effect of the suggestive identification itself. 432 U.S. at 114, 97 S.Ct. at 2253.

■ Reliability of the in-court identification testimony is to be assessed under the totality of the circumstances. *Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972); *State v. Higgins,* 592 S.W.2d 151, 160[13] (Mo. banc 1979), *appeal dismissed,* 446 U.S. 902, 100 S.Ct. 1825, 64 L.Ed.2d 254 (1980).

Missouri courts have been steadfast in their application of the above principles. *State v. Story,* 646 S.W.2d 68, 71 (Mo. banc 1983); *State v. Charles,* 612 S.W.2d 778, 780 (Mo. banc 1981), *cert. denied,* 454 U.S.

972, 102 S.Ct. 522, 70 L.Ed.2d 392 (1981); *State v. Carter,* 572 S.W.2d 430, 435 (Mo. banc 1978); *State v. Moore,* 726 S.W.2d 410, 412–13[4, 5] (Mo.App.1987); *State v. Trimble,* 654 S.W.2d 245, 253–54 (Mo.App. 1983).

■ Applying the first of the five numbered factors, we note that Lester, Jr., during his conversation with defendant some 15 minutes before the burglary, was within 2 or 3 feet of defendant for 3 or 4 minutes. While the time when the conversation occurred is not precisely fixed, Lester, Jr., recalled it was around 5:30 or 6:00 p.m., "still full daylight." When the station wagon returned some 15 minutes later, Lester, Jr., according to his testimony at the suppression hearing, observed defendant "probably four minutes" at a distance of "twenty or thirty feet."

Regarding the second factor, it is manifest that Lester, Jr., gave a high degree of attention to defendant and his companions on their initial stop at the house, and again on their return. Nothing else was occurring on either occasion to distract Lester, Jr.'s attention from the trio, and his suspicions had obviously been aroused when they left the first time going the opposite direction he had given.

As to the accuracy of Lester, Jr.'s descriptions of defendant and his companions (the third factor), Ivy testified without contradiction that when he confronted the two suspects in Madison County a few hours after the burglary, they matched Lester, Jr.'s general description of the two passengers in the station wagon. As to defendant, we find nothing in the transcript contradicting Lester, Jr.'s description of him.

At trial, some 17½ months after the burglary, Lester, Jr., demonstrated a high level of certainty in identifying defendant (the fourth factor). Lester, Jr., testified:

"Q. Is ... the defendant that's seated here today, the same person that was at your house?

A. Yes sir.

Q. The same person that kicked the door in?

A. Yes.

Q. Is there any doubt in your mind about that?

A. No doubt."

As to the fifth factor—the time between the crime and the confrontation—Lester, Jr., testified at trial that he had confronted defendant at the preliminary hearing 2 or 3 months after the burglary, and had identified him at that hearing. That interval was much shorter than the 8 months in *Simmons*. In *Story*, a conviction of selling marihuana was upheld where 17 months elapsed between the date the undercover officer purchased the marihuana and the date the officer saw a photograph of the accused, and 3 more months elapsed before the officer confronted the accused in person at trial.

Having considered the five factors above, we next inquire whether there was anything suggestive in the circumstances under which Lester, Jr., identified defendant's photograph.

Of the three photographs shown Lester, Jr., by his father, one was of Pratt and one was of Staples, both of whom had been confronted in person and identified by Lester, Jr., the day after the burglary. The remaining photograph shown Lester, Jr., was of defendant, the only arrestee Lester, Jr., had not confronted and identified. Thus, the instant case is analogous to one where a single photograph of a suspect is shown to a witness. Missouri courts have consistently held that the showing of a single photograph does not require a suppression of eyewitness identification when there are other factors supporting the identification. *State v. Parker*, 458 S.W.2d 241 (Mo.1970); *State v. Burnside*, 527 S.W.2d 22 (Mo.App.1975); *State v. Williams*, 522 S.W.2d 327 (Mo.App.1975); *State v. Garrett*, 518 S.W.2d 97 (Mo.App.1974). Consequently, even if showing Lester, Jr., only photographs of the three arrestees was suggestive, the crucial question is what effect, if any, it had on the in-court identification of defendant by Lester, Jr.

In examining that subject, we note there is no evidence that Lester, Jr., was aware of the information that led the authorities to arrest defendant. Lester, Jr., did know, of course, that defendant had not been arrested with Pratt and Staples, as several days elapsed between the date he identified that duo in person and the date he was shown the three photos. Thus, while Lester, Jr., could have reasonably inferred, when he was shown the photos, that the authorities had reason to suspect defendant was the third culprit, Lester, Jr., had to have known that such suspicion was based on different circumstances than those involving Pratt and Staples. Lester, Jr., could also have reasonably assumed that the authorities needed to know whether their suspicion of defendant was well founded by seeing whether Lester, Jr., would confirm or deny that defendant was the third burglar.

The other suggestive element is the possibility that the elder Ruble told Lester, Jr., that the three photographs were of the men who committed the burglary. The elder Ruble so testified at trial. Lester, Jr., however, testified at the suppression hearing and again at trial that while his father could have said that, he (Lester, Jr.) did not remember. It is thus evident that even if the elder Ruble made such a statement, it had little, if any, effect on Lester, Jr., as he could not recall it being made.

Weighing the five factors heretofore discussed against the possible corrupting effect of the two suggestive elements about which defendant complains, we hold that under the totality of the circumstances the photographic identification of defendant by Lester, Jr., was not made under conditions so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. That being so, even had defendant's first point been preserved for appellate review, it would be without merit. It follows that defendant's in-court identification by Lester, Jr., did not result in manifest injustice or a miscarriage of justice entitling defendant to plain error relief.

■ We now turn to defendant's second point. Five days before trial, defendant filed a petition for writ of habeas corpus ad testificandum, averring that a material witness, one Harold Jett, was in the custody

of the Department of Corrections at the Jackson County jail in Kansas City. The petition prayed for a writ of habeas corpus commanding the director of the Jackson County jail to bring Jett before the trial court on the morning of trial. The trial court issued the requested writ the date the petition was filed, and the writ was mailed to the Sheriff of Jackson County for service.

On the morning of trial, defendant's counsel announced ready for trial. After the jury had been selected, but prior to its being sworn, defendant's counsel stated: "At this time we would move the Court to continue this matter because we have been unable to compel the attendance of one Harold Jett, who is a material witness in this matter, an alibi witness, to be exact."

The circuit clerk, called as a witness by defendant's counsel, testified he (the clerk) had contacted the Sheriff of Jackson County about the writ, and that the Sheriff had not received it "as of yet and that was about twenty minutes ago."

Defendant, called by his counsel as a witness in support of the motion for continuance, testified that Jett picked him up at the bus station in Kansas City Saturday afternoon, October 5, 1985, and that Jett would testify he was with defendant in Kansas City that day. Asked how he knew Jett was in the Jackson County jail, defendant replied that he had received a letter from his brother "[l]ast week sometime."

The trial court denied the requested continuance. Defendant maintains that ruling was reversible error.

Rule 24.09 provides:

"An application for a continuance shall be made by a written motion accompanied by the affidavit of the applicant or some other credible person setting forth the facts upon which the application is based, unless the adverse party consents that the application for continuance may be made orally."

Defendant's failure to request the continuance by a written motion accompanied by the required affidavit is a sufficient ground for us to affirm the trial court's ruling. *State v. Merrick*, 677 S.W.2d 339, 342 n.

2[4] (Mo.App.1984); *State v. Diamond*, 647 S.W.2d 806, 808[2] (Mo.App.1982); *State v. Shryock*, 593 S.W.2d 906, 908[1] (Mo.App. 1980).

Furthermore, the motion came only after defendant's counsel had announced ready for trial and the jury had been selected. Defendant's counsel had given the trial court no prior warning that more time was needed to produce Jett.

In *State v. Boykins*, 399 S.W.2d 70 (Mo. 1966), after the trial proceedings had commenced but before the jury was sworn, the accused's lawyer orally requested a continuance to obtain the attendance of two alibi witnesses. Upholding the trial court's denial of the request, the Supreme Court noted that such request had not come until the jury was in the box ready to try the case and the judge was directing the trial to proceed. *Id.* at 74. The Supreme Court said, "[The accused] should not wait until the very minute of trial to determine if a witness he contends to be material to his defense is available." *Id.*

In *State v. Reynolds*, 345 Mo. 79, 131 S.W.2d 552 (1939), the accused's lawyer sought a continuance on the morning of trial because a defense witness was absent. A subpoena for the witness, issued 11 days before trial, had remained unserved because the sheriff had been unable to find the witness. There was no showing that the accused had made an effort to ascertain from the sheriff whether he had served the subpoena until the case was called for trial. 131 S.W.2d at 555. Affirming the trial court's denial of the application, the Supreme Court said, "We feel we are not putting an undue burden on litigants in saying they ought not to wait until the very minute of trial to find out whether their subpoenas have been served." *Id.*

It is also noteworthy that in the instant case, nothing in the record indicates defendant's counsel ever verified that Jett was in the Jackson County jail. The only evidence Jett was there was defendant's testimony that a letter from his brother

had said so. The letter was not produced at trial.

Defendant did not testify in front of the jury. However, his half brother, Gerald Francis Tettamble, testified that he (Gerald) was with Jett when the latter picked up defendant at the bus station on the afternoon of October 5, 1985. According to Gerald, he and defendant were taken by Jett to the home of one James "Duke" Smith in Platte City, where they spent the night. Gerald explained he recalled the date because he had just been paroled from prison. Gerald acknowledged he had been convicted of second degree murder, burglary, auto theft, uttering a forged instrument, peace disturbance, and "traffic tickets." Asked where he had first met Jett, Gerald replied, "In prison." Gerald added that he had never met Smith, but that defendant knew Smith from prison.

Gerald was the only witness called by defendant.

■ An application for a continuance in a criminal case is addressed to the sound discretion of the trial court, and an appellate court will not interfere unless it clearly appears that such discretion has been abused. *State v. Scott,* 338 S.W.2d 873, 876[4] (Mo.1960). This general rule applies where a continuance is sought on account of the absence of material witnesses. *Id.*

In view of defendant's (a) failure to comply with Rule 24.09, (b) failure to check with Jackson County authorities regarding service of the writ prior to trial, and (c) failure to request a continuance until after the jury had been selected, we hold that the trial court did not abuse its discretion in denying the requested continuance. Thus, even had defendant's second point been preserved for appellate review, it would be unavailing.

■ It is even more evident that defendant is entitled to no plain error relief. In addition to the incriminating evidence already discussed, Ivy testified that when he saw the station wagon in Madison County a few hours after the burglary, he searched it and recovered two coins. The coins were shown to the elder Ruble at trial, and he testified they appeared to be coins that were in his home prior to the burglary. In view of the compelling evidence of defendant's guilt, we hold that no manifest injustice or miscarriage of justice resulted from the denial of the request for continuance.

Judgment affirmed.

GREENE, P.J., and HOLSTEIN, J., concur.