STATE of Missouri,
Plaintiff–Respondent,

v.

Lisa HARRIS, Defendant–Appellant.

Lisa HARRIS, Movant–Appellant,

v.

STATE of Missouri, Respondent.

Nos. 15495, 16069.

Missouri Court of Appeals,
Southern District,
Division One.

Oct. 23, 1989.

Motion for Rehearing or to Transfer to
Supreme Court Denied Nov. 13, 1989.

Application to Transfer Denied
Jan. 10, 1990.

William L. Webster, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

Anne A. Hall, Public Defender, Springfield, for defendant-appellant-movant.

GREENE, Judge.

In these consolidated appeals, defendant, Lisa Harris, seeks to set aside the trial court's judgment affirming a jury verdict finding her guilty of murder in the first degree, § 565.020.1,[1] for which crime she was sentenced to life imprisonment without parole.

In her direct appeal, Lisa claims the trial court erred by (1) refusing to instruct the jury on the crime of voluntary manslaughter, (2) failing to instruct as to whether her confession was voluntary, (3) overruling a motion to suppress her confession, (4) denying her attorney's motion for a continuance, and (5) refusing to let her witnesses testify concerning certain matters which Lisa contends would have been proof of Hill's reputation for being a violent and turbulent person.

In her motion filed under Rule 29.15 to vacate her conviction and sentence, Lisa contended she received ineffective assistance of trial counsel. The motion court, without evidentiary hearing, denied the motion on the ground that it was not timely filed. We affirm the trial court's judgment of conviction and sentence, and the motion court's denial of the motion to vacate.

Viewed in the light most favorable to uphold the judgment of conviction of the crime of first degree murder, the evidence adduced at trial was as follows. In the early morning hours of February 10, 1987, Lisa, her brother, Billy, Lisa's boyfriend, John Brian Stephens, her roommate, Jennifer Fair, and two friends, Scott Sanger and David Hight, drove to the home of the victim, John Hill, in Billy Harris' automobile, to "kick some ass" after an alleged sexual assault by Hill on Jennifer. Hill's residence was in Neosho, Newton County, Missouri. The girls were armed with a claw hammer, a club, and a knife. The girls entered the Hill residence, while the men waited outside. When the men heard one of the girls scream for help, they entered the house. When they did so, Sanger saw Lisa hit Hill in the head with the hammer at least five times, while Jennifer was beating Hill with the club. When Hill fell to his knees, Lisa said to him, " 'Yeah, John, you really fucked up this time, didn't you?' " She then kicked him in the abdomen and groin. Hill then dropped face down on the floor, at which time Lisa knelt beside him and stabbed him in the back a number of times with a "butterfly" knife she had brought to the crime scene. The group then left, taking with them Hill's

---

1. Unless indicated otherwise, all references to statutes are to RSMo 1986, V.A.M.S., and all references to rules are to Missouri Rules of Court, V.A.M.R. 1.

bank card, which Billy Harris and Brian Stevens later attempted to use, a knife with a scabbard bearing Hill's initials, JFH, and a Colt Python .357 magnum revolver and holster that belonged to Hill.

An autopsy revealed that there were six "punched out" circular holes in Hill's head which passed through the skull and into the brain, all of which were consistent with injuries caused by a hammer, and any one of which would have caused the death. The autopsy also revealed Hill had five stab wounds in the back.

While investigating the murder, deputy sheriffs noticed that Lisa had what appeared to be blood on her shoes, and took her to the courthouse for questioning. She was informed of her constitutional rights, including her right to remain silent and her right to the services of an attorney, after which she gave a statement in which she admitted that she had hit Hill in the head with the hammer and stabbed him in the back with the knife. After Lisa was arrested and confined in jail, she made incriminating statements regarding her part in the killing to two other inmates and to a deputy sheriff. She later told sheriffs deputies that the weapons that were used in the killing were hidden in a nearby cave. The deputies went to the cave and found the hammer and the knife.

After Lisa was charged with the crime of first degree murder, the case was moved to Greene County on a change of venue after which, on October 9, 1987, a jury found her guilty of murder in the first degree. The trial court, on November 16, 1987, after overruling her motion·for new trial, affirmed the jury verdict, and sentenced Lisa to life imprisonment without possibility of probation or parole.

On July 1, 1988, Lisa filed a motion in the Newton County Circuit Court seeking to vacate her conviction and sentence on the grounds of ineffective assistance of trial counsel. Lisa's court-appointed attorney, on October 4, 1988, filed an amended motion to vacate in the Circuit Court of Greene County, where the judgment of conviction and sentence was entered. The Greene County Circuit Court dismissed the motion to vacate for the reason that it was not timely filed. This order was appealed, and that appeal was consolidated with the direct appeal of the conviction and sentence.

Lisa's first point relied on is that the Greene County Circuit Court erred in dismissing her Rule 29.15 motion on the grounds that it was not timely filed. She admits that her motion was not timely filed, in that it had not been filed on or before June 30, 1988, as is required in cases where, as here, the defendant was sentenced on or before January 1, 1988, and had not previously filed a post-conviction remedy motion. Rule 29.15(m). Her attorney seeks to excuse the late filing by arguing that since Harris was only 17 years old at the time she filed the original post-conviction relief motion, had a limited education, and only minimal prior contacts with the legal system, her tardy filing should be excused. This is an appeal for sympathy, not for the application of legal logic.

In *Day v. State*, 770 S.W.2d 692 (Mo. banc 1989), which is a consolidation of ten post-conviction relief appeals, our Supreme Court pointed out that Rule 29.15(m) provides that if sentence was pronounced prior to January 1, 1988, the effective date of Rule 29.15 which provides the new method of review for post-conviction relief complaints, a post-conviction review motion under 29.15 may be filed in cases where no prior review has been requested, but that such motion must be filed on or before June 30, 1988, and failure to file on or before such date constitutes a complete waiver of a right to proceed under Rule 29.15. *Id.* at 694. At least six of the movants had been sentenced prior to January 1, 1988, and had not filed post-conviction relief motions until July 1, 1988 or later. Our Supreme Court held that the time limitations of Rule 29.15 and its sister rule 24.035 are valid and mandatory, and that the motion court's judgments that the motions filed on July 1, 1988 were not timely filed were not clearly erroneous. *Id.* 695, 696. The Supreme Court, based on such reasoning, affirmed the motion

court's orders of dismissal in all of the cases. The factual situation here is exactly the same as that in *Day*. The point has no merit.

We now turn to the issues raised in the direct appeal.

In Lisa's second point relied on, she asserts the trial court erred in refusing to instruct the jury on the issue of voluntary manslaughter. She claims that she was entitled to such an instruction because there was evidence that she was defending herself from the aggression of Hill when she hit him with the hammer, which alleged fact supported the thesis that in order to justify a voluntary manslaughter submission, evidence of sudden passion arising from adequate cause must have been introduced.

The jury was instructed on the elements of first and second degree murder, and on the doctrine of self-defense. The trial judge refused to instruct on the elements of voluntary manslaughter because he did not believe that the evidence justified the submission of such a charge. We share that belief. Voluntary manslaughter is a lesser-included offense where the charge is murder in the first or second degree, but the trial court, even if requested to do so, is not obligated to give a lesser-included offense instruction unless there is a basis of acquitting the defendant of the offense charged and convicting him of the included offense. § 556.046.2.

Under § 565.023.1(1), a person commits the crime of voluntary manslaughter if he "[c]auses the death of another person under circumstances that would constitute murder in the second degree under subdivision (1) of subsection 1 of section 565.021, except that he caused the death under the influence of sudden passion arising from adequate cause...." Section 565.023.2, states that "[t]he defendant shall have the burden of injecting the issue of influence of sudden passion arising from adequate cause under subdivision (1) of subsection 1 of this section."

Sudden passion is defined by § 565.002(7) as follows:

'Sudden passion' means passion directly caused by and arising, out of provocation by the victim or another acting with the victim which passion arises at the time of the offense and is not solely the result of former provocation....

Adequate cause is defined by § 565.002(1) as follows:

'Adequate cause' means cause that would reasonably produce a degree of passion in a person of ordinary temperament sufficient to substantially impair an ordinary person's capacity for self-control....

The "provocation" referred to in the statute must be such that it renders the mind of the actor incapable of reflection and obscures his capacity to reason to such an extent as to indicate an absence of malice and premeditation on the part of the actor. *State v. Lett*, 715 S.W.2d 557, 560 (Mo.App. 1986). There is no evidence in this case to support such a theory. There is no evidence that Hill did anything to Lisa, prior to her striking him in the head with the hammer, that could reasonably have caused her to lose self-control and beat him to death, which is what the evidence indicates she did. Lisa's own evidence shows that she and Jennifer went to Hill's home with the avowed purpose of assaulting him, and that they took a claw hammer, a club, and a knife with them to do the job. When they knocked on the door, Hill answered, let the girls in, and resumed a conversation he was having on the telephone. At this point, the hammer, which Jennifer had in her jacket, fell to the floor. Lisa Harris picked up the hammer. Then, Hill jumped up from the couch and asked what was going on. Lisa swung at him with the hammer and hit Hill in the shoulder. He tried to ward off the blows, but was unable to do so, as Lisa continued to strike him in the head and face with the hammer. There is absolutely nothing in the evidence to indicate that Hill ever did anything at the crime scene that could reasonably produce a degree of passion in a person of ordinary temperament sufficient to substantially impair an ordinary person's capacity for self-control. Since there was no such evidence, Lisa was not entitled to an instruction on

voluntary manslaughter. *See State v. Hunter,* 755 S.W.2d 634, 638 (Mo.App. 1988), and *Lett,* 715 S.W.2d at 557, for examples of factual situations similar to those present here.

In *Hunter,* the defendant admitted in a taped statement that he had carried a gun into his estranged wife's home. While he was arguing with his wife, another man, Price, who was in the house "came runnin' in the room. I didn't know what he had. Seemed like he had somethin' in his hand. And I stood back and—and pulled the pistol out and shot him. And that's what happened. I'm just protectin' myself. This is a pretty big guy, you know...." Based on defendant's own testimony, the appellate court stated:

> Appellant's taped statement contains nothing to indicate that Mr. Price did anything to antagonize or provoke appellant that would 'reasonably produce a degree of passion in a person of ordinary temperament sufficient to substantially impair an ordinary person's capacity for self-control.' Nothing in this evidence suggests appellant shot victim because of sudden provocation capable of obscuring reason or rendering his mind incapable of reflection.

> While the evidence here showed some basis for acquittal on the charged offense of second degree murder, that basis, self-defense, was presented to the jury with a self-defense instruction. The jury rejected the claim of self-defense. That same evidence, while justifying the instruction on self-defense, provides no basis for convicting appellant on the lesser-included offense of voluntary manslaughter. The trial court did not err in failing to instruct on the lesser included offense of manslaughter.

*Hunter,* 755 S.W.2d at 638.

A similar result was reached in *Lett.* In that case Lett and Jones were arguing over a debt. Lett had brought a rifle to the place of the argument but had handed it to a third man, Harmon, before the argument began. Jones threatened Lett with a knife, and punched him in the face, but then broke off the altercation and walked away.

Lett retrieved the rifle from Harmon and shot Jones. The appellate court noted that the evidence showed a basis for acquitting the defendant of second degree murder. "That basis, self-defense, was, of course, rejected by the jury. The evidence does not, however, provide a basis for convicting Lett of the lesser-included offense of manslaughter." It further stated that "[t]here was absolutely nothing in evidence, or in any argument of Lett's trial and appellate attorney, that even remotely suggests that Lett shot Jones because of a sudden provocation capable of obscuring reason or rendering his mind incapable of reflection." *Lett,* 715 S.W.2d at 560.

As in *Hunter* and *Lett,* there was no evidence here that Lisa helped beat Hill to death because of any provocation by him sufficient to obscure her reason or render her mind incapable of reflection. All of the evidence in this case, including Lisa's testimony, indicates that the attack on Hill was planned in advance, and was not the type of spontaneous act required for a submission of voluntary manslaughter. The point has no merit.

▮ In her next point relied on, Lisa claims the trial court erred in not instructing the jury on the issue of the voluntariness of her confession. Lisa's trial counsel did not request such an instruction at the instruction conference at the close of the evidence, or in the motion for new trial, although the issue was raised in a motion to suppress, which the trial court, after hearing evidence, denied. The propriety of that denial has not been preserved for appellate review. Defense counsel on appeal recognizes this, but requests plain error review under Rule 29.12(b) which states: "Plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom."

▮ The giving of an instruction on whether a confession was voluntarily given is mandatory, if requested. MAI–CR 3d 310.06 Notes on Use 2. The decision on whether to request such instruction depends a great deal on defense counsel's

trial strategy. Lisa's defense was not that she did not kill Hill or assist in killing him, but that any blows she struck were done in self-defense. In her confession, Lisa gave her version as to the sequence of events that led to the death of Hill, which was not much different than the testimony she gave at trial which supported the self-defense theory. Perhaps defense counsel thought that self-defense was the only theory on which he stood a chance of gaining an acquittal, but we need not speculate as to what the motive was in not requesting the instruction in question. Under the circumstances, we do not feel that the trial court, absent a request to do so, was obligated to give the instruction, or that its failure to do so was of such magnitude so as to cause manifest injustice or a miscarriage of justice. The point has no merit.

In Lisa's next point relied on, she contends that the trial court erred in overruling her motion to suppress her taped confession in which she admitted her part in the killing of Hill. Lisa contends that she did not make a voluntary, knowing, and intelligent waiver of her constitutional right against self-incrimination before confessing to the crime because at the time "she was under the influence of narcotics and she was too young to know the implications of her actions at the time of making the admission or confession." Evidence was heard concerning the motion to suppress in the Circuit Court of Newton County before the case was transferred to Greene County on a change of venue, after which the motion was denied. After the case was transferred to Greene County, the motion was renewed and additional evidence heard, after which the motion was again denied.

A synopsis of the evidence given at the two hearings is as follows. Lisa Harris was 17 years old at the time of the murder. Her boyfriend was John Brian Stevens. Lisa was taken into custody by police officers at her parents' home about 8 p.m. on the evening of February 12, 1987. Lisa testified that before she was arrested, she took three blue pills (Valium), while her mother said that about an hour before the

police arrived, she saw Lisa with 10–12 pink, blue, orange and red pills in her hand, and that Lisa swallowed them all. Lisa was taken to the law library in the Newton County Courthouse where Deputy Sheriff Kenneth Tatum read a *Miranda* rights waiver form to her. Lisa stated she understood her rights and signed the waiver form. At first, Lisa denied that she knew anything about the incident. Sheriff Bridges told Lisa that Brian Stevens was in the next room "setting the record straight." Lisa said to the sheriff, " 'You show me from Brian's mouth that he's telling you the truth, and I'll answer any question you have.' " Lisa was then taken to the office where Stevens was being interviewed. Stevens told Lisa, " 'I'm telling them everything, and you should too.' " Lisa, Deputy Tatum and Deputy John Glore then returned to the library where Lisa gave two oral statements, one of which was taped, implicating herself in the murder of Hill. The interviews started at approximately 8:45 p.m. and ended about 9:50 p.m.

Glore, who had approximately seven years' experience as a law enforcement officer, testified that he had, during that time, observed many people under the influence of alcohol and drugs, including depressant drugs, and that, in his opinion, Lisa was not under the influence of alcohol or drugs from the time she was taken into custody until the time when she gave her statements. While Glore testified that during Lisa's taped statement she appeared to be in "almost a trance state," he said he did not mean she appeared to be under the influence of drugs, but rather it seemed to him like she was reliving the murder in her mind as she gave her statement.

Where, as here, there is conflicting evidence of the voluntariness of a confession, the admission of the confession is a matter of discretion on the part of the trial court, which should not be lightly disturbed. *State v. Jensen*, 621 S.W.2d 263, 264 (Mo. 1981). The only question for us to decide is whether there was sufficient evidence to support the trial court's finding of voluntariness, viewing the evidence in a light that is supportive of the trial court's ruling,

and disregarding contrary evidence and inferences. *State v. Stokes*, 710 S.W.2d 424, 426, 428–429 (Mo.App.1986).

█ The question here involves the waiver of Miranda rights. *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), holds that in a *Miranda* waiver context, coercive police activity is a necessary predicate to a finding that a waiver of *Miranda* rights, or the giving of a confession, was not voluntary. There is nothing in the record to show that Glore and/or Tatum knew, or should have known, that Lisa was under the influence of narcotics when she signed the waiver and gave the statements. In fact, Glore testified that in his opinion she was not under the influence of narcotics at the time. In regard to the claim that Lisa was too young to know the implication of her actions at the time she signed the waiver and talked to the police, such allegation does not suggest police coercion. The law enforcement officers knew that Lisa was 17 years old, and that Stevens was her boyfriend, but we know of no court decision in any jurisdiction holding that such facts bar law enforcement officers from questioning a suspect. Lisa was not a juvenile, in which case she would have been entitled to have a lawyer, adult relative, or friend present and to be advised by them before signing a waiver. In cases of adolescents who are suspected of crimes, age alone, without more, does not prevent the suspect from validly waiving Miranda rights. *State v. Hunter*, 619 S.W.2d 883, 886 (Mo.App.1981). Despite the fact that Lisa was young, and may have been influenced by her boyfriend's advice to tell all, absent proof of official coercion, and there was none here, the waiver was not invalid, nor were the ensuing statements rendered inadmissible. The point has no merit.

Lisa's next point relied on is that she was denied effective assistance of trial counsel when the trial court overruled her motion for a continuance because "trial counsel had represented appellant for only a short time and was not prepared to try appellant's case."

A felony complaint charging Lisa with first degree murder was filed on February 12, 1987, in the Circuit Court of Newton County, and the public defender of Newton County was appointed to represent her on February 13. The public defender filed a number of motions in Lisa's behalf, including a motion to require the State to produce all reports, etc., that it had concerning the crime, a motion to suppress the confession Lisa had given, and a motion for change of venue. After the motion for change of venue was sustained and the case transferred to Greene County, the Greene County public defender began representing Lisa on or about June 16, 1987. On that date the prosecuting attorney of Greene County and the public defender were notified that the case was set for trial on October 5, 1987 at 9:00 a.m. Thereafter, the Greene County public defender filed a number of motions on Lisa's behalf, including a motion for an independent psychiatric examination of Lisa, motions for additional discovery, etc. Also, depositions of three witnesses were taken on Lisa's behalf. On September 9, 1987, the public defender was permitted to withdraw as attorney for Lisa, because a private attorney had filed an entry of appearance for her. The public defender was directed to tell Lisa's new attorney that the trial date was October 5, 1987.

On September 14, 1987, during a hearing on the State's motion to compel Lisa to give handwriting samples, her attorney orally moved for a continuance. The trial court's docket sheet shows that the motion was overruled. On October 5, 1987, which was the morning the trial began, defense counsel again orally moved for a continuance. At this time, the following exchange occurred between the prosecutor, the defense attorney, and the trial judge:

THE COURT: Mr. Costantinou, please stand and make your oral motion. I'm confused as to what you want. Tell me what you want and the reasons why.

MR. COSTANINOU [sic]: I would like an extension of time, even at this late date, because I haven't had the opportunity to properly do the things that I think should be done on this trial, which include a variety of motions, discovery re-

quests, pretrial orders, this type of thing. And I'm more than familiar with the severity of the case, that they're asking for a life imprisonment without any chance of probation or parole. Because of this I think it's important that the Court give us this time.

Now, when we brought up the matter before in our first conference and first pretrial discovery downstairs in another courtroom, the Court said that its time schedule was unable to accommodate us on this, and my feeling is that even though that may be true, I don't think that's an adequate reason.

THE COURT: Well, so far you haven't mentioned anything specifically that you wanted to do that you have not had the opportunity to do. If you want to be specific, now is your opportunity.

MR. COSTANINOU [sic]: Well, I think that we need the opportunity to interview all of the various witnesses, and that would include taking depositions where necessary, to have the opportunity to confer more with our client, and have the opportunity to better visit the scene, look it over, have the opportunity to request additional information from the state, essentially to do a better investigation into the facts and the background of this, which is time consuming.

THE COURT: Has the state failed to comply with any requests you've made for information?

MR. COSTANINOU [sic]: No, sir.

THE COURT: Has the state failed to comply with any requests you made to visit the scene?

MR. COSTANINOU [sic]: No, sir.

THE COURT: Has the state failed to comply with any requests you made to interview witnesses?

MR. COSTANINOU [sic]: No.

THE COURT: Have any witnesses refused to talk to you?

MR. COSTANINOU [sic]: Yes.

THE COURT: Who?

MR. COSTANINOU [sic]: Apparently LaDonna Otten was told by Mr. Perigo not to talk to us.

THE COURT: Say that again.

MR. COSTANINOU [sic]: LaDonna Otten.

THE COURT: How do you spell her last name, do you know?

MR. COSTANINOU [sic]: O-t-t-e-n, I believe.

THE COURT: O-t-t-e-n?

MR. COSTANINOU [sic]: Yes, sir.

THE COURT: All right. Mr. Perigo, is she expected to be a witness?

MR. PERIGO: Not at the present time, but for the record what I told her was, 'You can talk to the opposing counsel, but I prefer to be present.'

THE COURT: All right. Any other witness who has refused to talk with the defense counsel?

MR. COSTANINOU [sic]: No.

THE COURT: Any pretrial orders that you have in mind that the Court should make in this case that it has not already made?

MR. COSTANINOU [sic]: No, I can't think of any.

THE COURT: All right. Before La-Donna Otten will be permitted to testify in this case, the attorney for the defendant will have the opportunity to talk with her here at the courthouse. So you all can make arrangements if you know you intend to use her, make arrangements for her to be here just shortly before her testimony.

The oral motion for extension of time is denied.

The granting or denial of a motion for continuance is within the sound discretion of the trial court. A very strong showing is required to prove an abuse of that discretion, and the party who requested the continuance bears the burden of showing prejudice resulted from the denial of the motion. *State v. Nave*, 694 S.W.2d 729, 735 (Mo banc 1985), cert. denied, 475 U.S. 1098, 106 S.Ct. 1500, 89 L.Ed.2d 901 (1986). The rule regarding continuances in a criminal case, Rule 24.09, reads as follows:

An application for a continuance shall be made by a written motion accompanied by the affidavit of the applicant or some other credible person setting forth

the facts upon which the application is based, unless the adverse party consents that the application for continuance may be made orally.

■ Here, the request for a continuance was made orally, and there is nothing in the record that indicates the prosecutor consented to the request. Although the prosecutor did not object, Lisa's failure to request the continuance by written motion with a supporting affidavit is sufficient grounds to affirm the trial court's ruling. *State v. Tettamble*, 746 S.W.2d 433, 439 (Mo.App.1988). While the trial court would have been able to deny the oral motion on the grounds that it did not comply with the dictates of Rule 24.09, there are additional reasons why the denial was not an abuse of discretion. In his oral motion, defense counsel did not state why he had been unable to prepare for trial, what he hoped to accomplish by additional delay, or what facts he would be able to uncover by more investigation. The only person he named as a possible witness for the State with whom he had not spoken did not testify. Since there was no satisfactory showing of what might have been accomplished by delaying the trial date further, and since the proof of guilt adduced at trial was overwhelming, there was no clear abuse of discretion in denying the motion. The point has no merit.

In her final point relied on, Lisa contends the trial court erred in (1) not allowing her proffered witness, Ronald Ferguson, to testify, (2) refusing to allow her to place in evidence a hypodermic syringe found in the victim's car after the murder, and (3) refusing to allow her to testify concerning the victim's conduct on either February 4th or 5th. Lisa contends that all of such evidence, if admitted, would have shown the victim's reputation in the community for violent or turbulent behavior, which evidence was relevant to show who was the aggressor, and whether Lisa had a reasonable apprehension of danger at the time of her attack upon Hill, which facts were an integral part of her self-defense claim. While there is no doubt but that such evidence is relevant, it must be proved by general reputation testimony, not by specific acts of violence, and defendant must show he knew of such reputation if he is to prove whether a reasonable apprehension of danger existed. *State v. Buckles*, 636 S.W.2d 914, 922 (Mo. banc 1982).

■ We first address the question of the trial court's refusal to allow Ronald Ferguson to testify as a witness for the defense. A hearing was held outside of the presence of the jury to determine if Ferguson, as defense counsel put it, "knows the reputation for truth, veracity and the general reputation of the deceased in the community ..." We note that Hill's reputation for truth and veracity was not an issue in the case. The only conceivable evidence concerning Hill's reputation that would have been admissible would be his general reputation on whether he had a violent and turbulent disposition, which testimony would be relevant in a case where the defense was, as here, self-defense. However, Ferguson was never asked a question concerning Hill's reputation for violent behavior during his questioning by defense counsel and the trial court. In fact, Ferguson never testified that he was familiar with Hill's general reputation in any area, instead he confined his answers to his personal opinion that Hill was a drug dealer, a liar, and an untrustworthy person. Following Ferguson's testimony, the trial court sustained the State's objection to its relevancy, and Ferguson was not permitted to testify. Ferguson's offered testimony was not evidence of Hill's general reputation for violence. Since it was not, the trial court was correct in sustaining the objection.

■ The same could be said for the trial court's refusal to let the defense put in evidence their Exhibit K which was a photograph of a hypodermic syringe found in Hill's car after his death. What this would have to do with showing Hill's reputation for violence escapes us. At best, the hypodermic syringe might be evidence of a specific bad act on Hill's part (using illegal drugs), but, even if we indulge in such speculation, it was not proof of his violent or turbulent reputation. *See State v. Rob-*

*inson,* 556 S.W.2d 73, 74 (Mo.App.1977). Since it was not, the photograph was inadmissible, and the trial court's ruling was correct.

The final prong of this trilogy is Lisa's complaint that she was prevented by the trial court from testifying concerning Hill's reputation for violence. We have searched the record in vain for proof of any such contention. Lisa was testifying when she started to relate what had happened on February 5th when she first met Hill at the Ramada Inn in Neosho. Lisa and a friend, Georgiana Mills, were in the jacuzzi when Hill and Jennifer Fair came into the room. Jennifer introduced Hill to Lisa and Georgiana and then went back to work in the motel bar. According to earlier testimony given by Jennifer, Hill was dressed in a three-piece suit, and was intoxicated. Hill started to remove his clothing so that he could get in the jacuzzi with Lisa and Georgiana. Jennifer was called and she persuaded Hill to put his clothes back on and leave, which he did. When Lisa was asked about the incident by her attorney, the following exchange occurred:

(Counsel for the state, counsel for the defendant, and the court reporter approached the bench and the following proceedings were had and entered of record):

MR. LANDOLT: Your Honor, I object to any testimony about what happened between her and Mr. Hill on the evening of February the 5th—I think we are talking about February the 5th right now—on the grounds of relevancy and remoteness, this is a long distance from the time of the crime.

MR. COSTANTINOU: I'm just trying to show that she was introduced to the man and what type of appearance he made, what type of person she thought he was, that type of thing, nothing that I think would surprise any of us, at least I don't think so.

THE COURT: Well, just ask precise questions and I'll limit her answers to the questions and rule on all objections.

MR. COSTANTINOU: Okay.

(End of bench conference.)

THE COURT: You may proceed.

Q. (By Mr. Costantinou) Now, how long did Mr. Hill stay there?

A. In the pool room?

Q. In the pool room, is that what you said?

A. In the pool room, that's what I asked, how long did he stay there?

Q. Yes.

A. About thirty minutes or so.

Q. Then did he leave?

A. Yeah, after Jennifer had to come and get him.

Q. Okay.

A. She had to make him leave.

MR. COSTANTINOU: Your Honor, I think we're going to have to approach the bench for just—

THE COURT: Well, you may, but why don't you ask your next question?

MR. COSTANTINOU: All right.

(By Mr. Costantinou) Why did she have to make him leave?

MR. LANDOLT: Well, Judge, maybe we should approach the bench.

THE COURT: The objection is sustained.

(By Mr. Costantinou) Would it be fair to say you didn't want him around the pool?

MR. LANDOLT: Judge, I object on the grounds of relevancy.

THE COURT: The objection is sustained. Move on to another topic.

Since defense counsel made no offer of proof as to what Lisa would testify to, if allowed to testify further about Hill's actions on the date in question, the claim was not preserved for appellate review. *State v. Smith,* 725 S.W.2d 631, 633 (Mo.App. 1987). The point has no merit.

The judgment of the trial court is affirmed.

CROW, P.J., and HOLSTEIN, Special Judge, concur.