STATE of Missouri, Appellant,

v.

Kevin C. DIXON, Respondent.

No. ED 95181.

Missouri Court of Appeals,
Eastern District,
Division Four.

Dec. 21, 2010.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Feb. 8, 2011.

Application for Transfer Denied
March 29, 2011.

Paul R. Boyd, Benton, MO, for appellant.

Rosalynn Koch, Columbia, MO, for respondent.

ROBERT G. DOWD, JR., Judge.

The State of Missouri filed this interlocutory appeal of the trial court's order suppressing a portion of Kevin Dixon's ("Defendant") statement and the videotaped demonstration. The State contends the trial court clearly erred in suppressing a

portion of Defendant's statement and the videotaped demonstration because the trial court failed to consider the totality of the circumstances and incorrectly found a promise of leniency was made to Defendant during the interview. We reverse and remand.

On March 24, 2009, an eight-month-old baby boy, was critically injured at his house in Sikeston, Missouri. He sustained three complex skull fractures, a fracture of his pubic bone, brain swelling, and spinal cord swelling. Defendant was in the house with the baby at the time the baby sustained the injuries. The baby was taken to a hospital in St. Louis, Missouri for treatment.

On March 24, 2009, police officers spoke to Defendant, and Defendant denied any criminal wrongdoing. Defendant was read his *Miranda*[1] rights and signed a form waiving his rights. Defendant stated he tried to give the baby a "sippy cup" of formula and the baby quit breathing so Defendant called 911. Defendant was released pending an investigation.

On March 30, 2009, Detective Andy Caton and Detective Jon Broom interviewed Defendant a second time. Defendant voluntarily came to the police station. Defendant was read his *Miranda* rights again and again signed a form waiving his rights, and voluntarily agreed to talk to the detectives. The interview lasted approximately one hour and forty-five minutes. During the interview, Defendant provided three different explanations as to how the baby was injured. Defendant's first explanation was that the baby fell off the couch. His second explanation was that the baby fell from his arms from a height of about three to five feet. Defendant's third explanation was that he had placed the baby on top of

the refrigerator and the baby fell, hitting his head on the kitchen floor. After he revealed that all of his explanations were lies, the detectives again told Defendant that he needed to be honest to help the baby. Defendant subsequently confessed to throwing the baby against a wall when he would not stop crying. Defendant also performed a videotaped demonstration of how he threw the baby using a doll.

On March 31, 2009, Defendant was charged with assault in the first degree, Section 565.050, RSMo 2000,[2] and felony child abuse, Section 568.011. On April 1, 2009, the baby died as a result of his injuries. On April 2, 2009, Defendant was charged with murder in the first degree, Section 565.020 and felony child abuse after the previous charges were dismissed by the State. The case was subsequently transferred from Thirty–Third Judicial Circuit Court in Scott County to Twenty–First Judicial Circuit Court in St. Louis County.

Thereafter, Defendant filed a motion to suppress his statements. Defendant alleged that he invoked his right to remain silent and that his statements were not voluntary because they were induced by promises of leniency made by the detectives. A hearing was held on Defendant's motion. Detective Caton was the only witness at the hearing. Detective Caton testified that he did not believe Defendant ever invoked his right to remain silent. Detective Caton further testified that as part of the detectives' interview tactic, they told Defendant he needed to tell them what happened to help the baby.

■ After the hearing on Defendant's motion to suppress, the trial court found Defendant had not invoked his right to remain silent. However, the trial court

---

**1.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**2.** All further statutory references are to RSMo 2000.

found the detectives made a promise of leniency to Defendant. In finding a promise of leniency, the trial court relied on the following exchange:

> DETECTIVE CATON: What did we tell you when you first walked in here? What is the first thing we told you? You can't possibly get in any[ ]more trouble than you are in right now. I swear to you.
>
> [DEFENDANT]: What kind of trouble am I in right now?
>
> DETECTIVE CATON: You're in trouble for hurting that baby. Now, do you want to try and help that baby? No matter what you say, no matter what you say you can't be in any[ ]more trouble. No matter what you say. I told you, if you took that kid and threw it a football field length, you can't be in any[ ]more trouble. You got my word on that.

The trial court noted Defendant then made numerous statements about what happened to the baby and eventually admitted to throwing the baby against a wall. In its decision, the trial court stated:

> The detective informed [ ][D]efendant he "was in trouble for hurting the baby" and that no matter what he said, he could not be in any more trouble. The detective went on to say "You got my word on that." Defendant subsequently made numerous statements as to how the baby was injured, finally admitting throwing the baby and he was charged with murder in the first degree.
>
> \* \* \*
>
> Only after receiving the detective's word that he could not be in any more trouble if he told the detectives how the baby was injured, did [D]efendant confess to throwing the baby. At the time he made the statement, [D]efendant had

been told he was "in trouble for hurting the baby," not for killing the baby. He was, however, charged with murder in the first degree, and faces a life sentence without the possibility of parole if convicted.

The trial court did not make any finding regarding the voluntariness of Defendant's statements. The trial court ordered the statements after the promise of leniency and the videotaped demonstration to be suppressed and inadmissible at trial. The State filed this interlocutory appeal.

■ In its sole point, the State contends the trial court clearly erred in suppressing a portion of Defendant's statement and videotaped demonstration because the trial court failed to consider the totality of the circumstances and incorrectly found a promise of leniency was made to Defendant during the interview.

■ The State has the burden of showing by a preponderance of the evidence that a motion to suppress should be denied. *State v. Rousan*, 961 S.W.2d 831, 845 (Mo. banc 1998). Appellate review of motions to suppress is limited to a determination of whether sufficient evidence exists to sustain a trial court's ruling. *State v. Looney*, 911 S.W.2d 642, 644 (Mo.App. S.D.1995). A trial court's ruling on a motion to suppress will be reversed only if clearly erroneous. *State v. Dickson*, 252 S.W.3d 216, 220 (Mo.App. E.D.2008). We defer to the trial court's factual findings and determinations of credibility.[3] *Id.* In reviewing the evidence, we consider all evidence and reasonable inferences in the light most favorable to the trial court's ruling. *Id.* If the ruling is plausible, in light of the record viewed in its entirety, we should not reverse, even if we would have weighed the evidence differently.

---

3. Here, the trial court did not make any specific credibility findings in its order.

*State v. Williams*, 277 S.W.3d 848, 851 (Mo.App. E.D.2009).

 It is well settled that a statement is not voluntary and is inadmissible if it was extracted by promises, direct or implied. *State v. Simmons*, 944 S.W.2d 165, 175 (Mo. banc 1997); *State v. Chandler*, 605 S.W.2d 100, 116–17 (Mo. banc 1980). "A promise to a defendant in custody does not *per se* make any statement he gives thereafter involuntary." *State v. Stokes*, 710 S.W.2d 424, 428 (Mo.App. E.D. 1986). All the circumstances surrounding the statement must be considered in determining if the defendant's will was overborne by the promise. *Id.* The nature of the promise must be considered. *Id.* The promise must be positive in its terms and clear in its implication. *Id.* The promise must directly relate to the crime charged and be made by one in authority to deliver it. *Id.* "[W]hether a statement is admissible hinges on its voluntariness in light of the totality of the circumstances, not on whether a promise was made." *Id.*

 Here, the trial court found there was a promise of leniency. The trial court's ruling is plausible, and we should not reverse, even if we would have weighed the evidence differently. Thus, we cannot say that finding was clearly erroneous. However, the fact that a promise was made is not the only consideration, we must also determine whether any statement given after a promise of leniency is voluntary in light of the totality of the circumstances. *See Id.* at 429–30 (the court found an implied promise was made by police officers during an interrogation, but after considering the totality of the circumstances also found the statements made by the defendant were voluntary.) Here, the trial court did not make a finding on whether Defendant's statements were voluntary after finding a promise of leniency had been made.

 "The issue of voluntariness is not resolved by labeling what a police officer said as a promise or not a promise, but by an analysis [of] the 'totality of the circumstances.'" *Id.* The test for whether a statement is voluntary "is whether the totality of the circumstances created a physical or psychological coercion sufficient to deprive the defendant of a free choice to admit, deny or refuse to answer the examiner's questions," *Simmons*, 944 S.W.2d at 173, and "whether the physical and psychological coercion was of such a degree that the defendant's will was overborne at the time he [made the statement]." *Rousan*, 961 S.W.2d at 845. The waiver of *Miranda* rights, while not dispositive of the question of voluntariness, is an important consideration. *State v. Dennis*, 153 S.W.3d 910, 921 (Mo.App. W.D.2005). Other factors to consider include the "defendant's physical and mental state, the length of questioning, the presence of police coercion or intimidation, and the withholding of food, water, or other physical needs." *Rousan*, 961 S.W.2d at 845.

After reviewing the entire record and considering the totality of the circumstances, we do not find Defendant's statements were involuntary after a promise of leniency. Applying the requisite factors, Defendant's statements to the police were not involuntary. First and foremost, Defendant was read his *Miranda* rights and signed a waiver of rights form. Second, Defendant's physical and mental state indicate he acted with a sound mind. Defendant admitted he was not on drugs during the interview. Defendant completed the eleventh grade and stated he did not have a mental problem. Defendant answered the questions with appropriate responses indicating a reasonably sound mind. Further, Defendant told the detectives he had been on probation before for robbery, indicating some experience with the legal system. *See Stokes*, 710 S.W.2d at 430 (the court stated, "[p]rior experience with the

criminal justice system is relevant as to the extent to which police custody and interrogation affect the psychological interplay of emotion and will.") Third, the detectives' interview was short. The interview started at about 1:15 p.m. and lasted only one hour and forty-five minutes. Finally, there is nothing in the record to indicate Defendant was physically coerced or deprived of food or water during the interview.

Moreover, a reading of the entire transcript of the interview demonstrates that Defendant's will was not overborne by a promise of leniency rendering his statements involuntary. At the time of the interview the baby was still alive, and the detectives repeatedly told Defendant to tell them what happened so they could help the baby and prevent the baby's death. The following exchange took place after Defendant admitted he was lying about the baby falling from his arms and the detectives analogize the situation to swimming, explaining Defendant was getting into the pool by dipping his feet in and he needed to jump in:

DETECTIVE CATON: No. You told us a lie. You're dipping your foot in the water. You need to jump in head first just like you said you do in that pool.

[DEFENDANT]: Yeah. I'm going to get 25 to life head first, too.

DETECTIVE BROOM: No, you're not.

DETECTIVE CATON: What did we tell you when you first walked in here? What is the first thing we told you? You can't possibly get in any[ ]more trouble than you are in right now. I swear to you.

[DEFENDANT]: What kind of trouble am I in right now?

DETECTIVE CATON: You're in trouble for hurting that baby. Now, do you want to try and help that baby? No matter what you say, no matter what

you say you can't be in any[ ]more trouble. No matter what you say. I told you, if you took that kid and threw it a football field length, you can't be in any[ ]more trouble. You got my word on that.

[DEFENDANT]: No, ain't no word. I don't care about no word.

DETECTIVE CATON: Then tell us what happened.

[DEFENDANT]: It don't even matter. Because like—so what you mean? So I'm going to jail after I get done talking to you-all?

DETECTIVE CATON: Uh-huh.

DETECTIVE BROOM: Until we can get ahold of—

[DEFENDANT]: For hurting the baby?

DETECTIVE CATON: If you want to see your baby—

[DEFENDANT]: For hurting the baby?

DETECTIVE CATON: For hurting the baby.

[DEFENDANT]: I'm going to jail for hurting the baby?

DETECTIVE CATON: For hurting the baby.

[DEFENDANT]: And if the baby die, I'm going to jail for murder?

DETECTIVE CATON: I didn't say that.

[DEFENDANT]: But that's what it's going to come out as, ain't it. If the baby die, then I'm going to jail for (inaudible).

DETECTIVE CATON: What we're doing right now is wasting time because we've not picked up that phone and made a phone call to the hospital that says this is what happened and that would explain it. Do you know how helpful it is to the doctors to say, oh, it was a wall, or it was a floor, or it was a roof, or it was a ball, or it was a bat, or it was this? Do you know how much that helps them?

[DEFENDANT]: I'm telling you-all he fell. I'm telling you.

DETECTIVE BROOM: Where did he fall from? It wasn't your arms. It wasn't the couch. What did· he fall from?

Defendant then went on to say the baby fell from on top of the refrigerator. After a lengthy exchange where Defendant ultimately admitted the baby had not fallen from the refrigerator, the following occurred:

DETECTIVE BROOM: So you want us to call up there to the hospital and call the Prosecutor and say, listen, [Defendant] is not going to give us an explanation to what happened—

[DEFENDANT]: No. No. No.

DETECTIVE BROOM:—to this baby?

[DEFENDANT]: No. No. No.

DETECTIVE BROOM: The baby is going to die, and you're going to be charged with murder first degree, life without is what you're going to get if you let that baby die. You're going to spend the rest of your life in prison without the possibility of parole. Is that what you want?

[DEFENDANT]: No.

DETECTIVE BROOM: Then you better start talking, and you better start telling the truth. I'm done playing, okay? You let that baby die, you're going to go to prison for the rest of your life. We can prove the injuries that happened to that baby happened at your hand. Do you understand that? No one else. We've got a baby there, a witness, however old she may be, that can say what she saw. It's recorded on DVD. Life without the possibility of parole, prison the rest of your life.[4]

Defendant then asked the detectives to listen to him and asked, "can you tell me what is going to happen?" The detectives told Defendant that they would first call the hospital to help the baby and then told him that "[i]f you let that baby die, you're going to go to prison for murder." The detectives continued to tell Defendant that they needed to know what happened to the baby so they could help the baby. Defendant subsequently began crying and told the detectives that he threw the baby against a wall. Defendant acknowledged that he knew he was going to "be locked up for a long time." Thereafter, Defendant demonstrated throwing the baby against the wall on videotape. The detectives subsequently told Defendant that they were going to call the hospital to let the doctors know what happened to the baby so they could help the baby get well. At the end of the interview Defendant told the detectives he was worried about being locked up for murder. Defendant stated "I just don't want to be locked up for murder. That's all I am worried about." Detective Broom replied "If the baby— hopefully, the baby won't die."

Upon looking at the totality of the circumstances, Defendant's will was not overborne from a promise of leniency rendering his statements involuntary. First, after the detective's statement that Defendant could not be any more trouble and gave him his "word," Defendant replied that he did not care about the "word" of the detective. Second, Defendant went on to make up another story about how the baby was injured. Third, Defendant's statements during the interview show his motivation for telling the detectives what happened was to prevent the baby from dying so he would not be charged with murder not because of a promise of leniency. Thus, the promise of leniency did

4. There was a second young child present at the house when the baby was injured. She gave a statement to the police indicating Defendant threw the baby against a wall.

not create a physical or psychological coercion sufficient to deprive him of a free choice in answering the detectives' questions. Thus, under the totality of the circumstances, we cannot say Defendant's will was overborne and therefore, Defendant's statements were voluntary.

The trial court did not clearly err in finding a promise of leniency. However, the trial court did clearly err in suppressing Defendant's statements and the videotaped demonstration because, under the totality of the circumstances, Defendant's statements were voluntary even when made after a promise of leniency.

We reverse the trial court's ruling on the motion to suppress and remand it to the trial court for proceedings consistent with this opinion.

KURT S. ODENWALD, P.J. and NANNETTE A. BAKER, J., concur.