

# Missouri Court of Appeals

## Southern District

### Division One

STATE OF MISSOURI, )
)
    Respondent, )
)
 vs. )  No. SD37164
)  Filed: May 26, 2022
ERIC A. HINES, )
)
    Appellant. )

### APPEAL FROM THE CIRCUIT COURT OF DENT COUNTY

Honorable Michael J. Randazzo, Judge

**<u>AFFIRMED</u>**

Eric A. Hines ("Hines") challenges his conviction, following a jury trial, of one count of statutory sodomy in the first degree. In two points relied on, Hines argues that the trial court erred in: (1) overruling Hines' motion to suppress statements, and in admitting Exhibit 10 (interview video) and Exhibit 11, (Hines' apology letter to Victim); and (2) in overruling Hines' motion to dismiss in violation of his right to a speedy trial. Finding no merit to either of Hines' points relied on, we deny the same and affirm the judgment of the trial court.

## Facts and Procedural History

Hines does not challenge the sufficiency of the evidence to sustain his conviction. On appeal, we consider the facts and reasonable inferences derived therefrom in the light most favorable to the verdict, and reject all contrary evidence and inferences. *State v. Phillips*, 319 S.W.3d 471, 474 (Mo.App. S.D. 2010). In that light, the following evidence was adduced at trial.

Victim was born in 2011. Hines lived with Victim and her mother, A.B., from late 2017 until July 2018, at which time he moved to Florida. Thereafter, A.B. abandoned Victim, who was later found by law enforcement during a drug bust in a "methamphetamine house" being cared for by two unknown individuals. The Division of Family Services was notified, took custody of Victim, and placed her with Travis Fulton, a third cousin. Shortly thereafter, guardianship of Victim was transferred to Travis and Barbara Fulton ("the Fultons"). The Fultons had known Victim since she was a toddler. Barbara Fulton was a nurse practitioner and Victim was a patient at Fulton's clinic.

Shortly after Victim came to live with the Fultons, Victim started exhibiting odd sexual behaviors at an excessive frequency, often in front of others. Victim's understanding of sex was also more advanced than it should have been for a seven-year-old child.

When Barbara Fulton approached Victim about the behavior, Victim stated that "her mom's boyfriend [Hines] . . . taught her these behaviors." Victim identified Hines by name. She was able to show Fulton what Hines had done to her and made her do to him. The abuse occurred between Christmas 2017 and the spring of 2018. Victim also mentioned a gun, stating that Hines threatened to kill her if she did not agree to the sexual abuse or if she told anyone about it.

The Fultons did not initially inform law enforcement about the abuse until Victim consistently told the same story and identifued the same person—Hines—as her abuser. In the

2

spring of 2019, Barbara Fulton contacted Detective Jonathan Counts ("Detective Counts"), with the Salem Police Department, and reported Victim's behavior and what Victim had recounted as to the sexual abuse she suffered at the hands of Hines. Victim underwent two Child Advocacy Center ("CAC") forensic interviews, one in June 2019 and the other in July 2019. In her interviews, Victim said that she told A.B. and Victim's older sister ("Sister") of the abuse. Detective Counts was present at both CAC interviews. Both interviews were videotaped, admitted at trial, and played for the jury.

Detective Counts also interviewed A.B. and Sister regarding Victim's CAC allegations that she had reported the abuse to A.B. and Sister. In the interviews, both denied Victim had ever told them about Hines' abuse.

Anne Wilson ("Wilson"), a nurse examiner for Kid's Harbor, conducted a sexual assault forensic examination of Victim. Victim recounted her sexual abuse by Hines. Upon examination, Victim had no visible injuries, which is not uncommon in sexually abused children.

In July 2019, Detective Counts located Hines in St. Augustine, Florida, but due to COVID restrictions, was unable to interview Hines until July 22, 2020. Upon being contacted by the St. John's County Sheriff's Department, Hines came to the sheriff's department to be interviewed. At approximately 45 minutes into the interview, Hines was given his *Miranda*[1] warnings, which he read aloud and signed, and then voluntarily continued speaking to Detective Counts. Up to this point, Hines was free to leave even after he was *Mirandized*. Hines did in fact go outside at one point to raise his car windows.

In interviewing Hines, Detective Counts "utilize[d] deception as a technique[.]" He felt it was "a strategy" and the "best way to get success[.]" Detective Counts told Hines a story about

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

an uncle who had engaged in an act with a minor in order to "relate with the subject to build rapport[,]" as it was a "very awkward thing to talk about and in order to do that you have to use techniques and strategies that help you get to that level."[2] Detective Counts also told Hines there was medical evidence that Victim had been penetrated and that it happened on her birthday when she turned seven—both statements were untrue.

Hines admitted he lived with Victim and A.B. from late 2017 through the spring and summer of 2018. He freely admitted he abused Victim "[t]wo, maybe three times." He described the incidents as having taken place in his bed, a chair swing, and at the side of a barn. Hines denied any penetration or ejaculation. Detective Counts never threatened Hines. Hines was very cooperative and talkative throughout the interview. The video of Hines' interview was entered into evidence as Exhibit 10, and played for the jury. Hines also wrote an apology letter to Victim stating, in part, that he was sorry for not being a better father, as the things they did "were not what fathers do with daughters." The letter was marked as Exhibit 11 and entered into evidence. At the conclusion of the interview, Hines was arrested and returned to Missouri.

On August 28, 2020, Hines was initially charged, by felony information, with two counts of felony statutory sodomy. On February 26, 2021, the felony information was amended and Hines was charged with one count of felony statutory sodomy in the first degree, pursuant to section 566.062,[3] in that on or between January 1, 2018 through July 11, 2018, he had deviate sexual intercourse with Victim who was less than 12 years old.

---

[2] Detective Counts testified that this interrogation tool was known as the "Reid interrogation technique" and described it as a "conversation between you and a defendant that you relate to the subject, you . . . build rapport with the subject so they get to know you better so they feel comfortable talking to you."

[3] All references to statutes are to RSMo Noncum. Supp. (2014), unless otherwise indicated.

On August 25, 2020, Hines filed a "Request for Speedy Trial," and on August 28, 2020, the hearing on the request was passed to September 28, 2020. On September 3, 2020, Hines filed a second Request for Speedy Trial.

On September 11, 2020, prior to the September 28, 2020 hearing to schedule a trial date, Hines filed a "Motion to Suppress" any statements Hines made to police on July 22, 2020, arguing those statements were not knowingly and voluntarily made and violated his *Miranda* rights. At the hearing on September 28, 2020, at which Hines and trial counsel both appeared, the trial court set a section 491.075 hearing and a hearing on the motion to suppress for November 4, 2020. After hearing testimony and argument on November 4, 2020, the trial court took the motion to suppress under advisement, and passed the case to November 23, 2020, for ruling and a trial setting.

Subsequently, on November 13, 2020, due to COVID restrictions imposed on the trial court, the trial court suspended "non-critical in-person court proceedings on the docket for November 23, 2020, and passed the case to December 14, 2020. The trial court indicated that the court would

> be in session and, if requested, can be available by Webex to take up 'the most critical' matters and 'proceedings necessary to protect the constitutional rights of criminal defendants.' If such a proceeding is necessary in this matter, counsel shall contact the Circuit Clerk as soon as possible to request the matter be placed back on the docket and so a specific time slot can be given for the hearing.

On November 22, 2020, the trial court, by docket entry, overruled Hines' Motion to Suppress.

On November 23, 2020, the trial court noted no appearances were made or requests received from the parties and passed the case to December 14, 2020.

On December 6, 2020, the trial court again suspended "non-critical, in-person court proceedings on the docket [set for] December 14, 2020," citing the Supreme Court's order

5

regarding the pandemic. The trial court explicitly noted that it would "be in session at 1:00 p.m. [on December 14] to take up 'proceedings necessary to protect the constitutional rights of criminal defendants[.]'"

On December 14, 2020, the docket entry indicates that the parties appeared and the case was passed to January 25, 2021, for motions and/or trial setting, with no objection by either party noted.

Thereafter, Hines filed: (1) a motion for Case.net access; (2) a request for hearing under section 491.075 (seeking to admit prior statements by a child); (3) a motion seeking to admit a prior visual and audio recording of a child under section 492.304; (4) and a motion for an order declaring witnesses unavailable. With these motions, Hines filed notices of hearings, with the first two motions noticed for hearing on January 25, 2021, and the last two motions noticed for hearing on February 22, 2021.

On January 25, 2021, the parties appeared and the case was again passed to February 22, 2021, for hearing on all motions.

On February 22, 2021, a hearing on Hines' pending motions was held. The trial court sustained in part the motion for Case.net access, and denied the motion to declare witnesses unavailable. Trial counsel did remind the trial court of Hines' pending request for speedy trial, and also advised that "we want to get this case set for trial." A jury trial was then scheduled for April 6, 2021. Trial counsel expressed their appreciation to the trial court for "making" the trial date happen.

On March 2, 2021, Hines filed a "Motion to Dismiss – Violation of Right to Speedy Trial," asserting that he was prejudiced by the delay as he had lost contact with two crucial witnesses. On March 22, 2021, the trial court heard argument on Hines' motion. Trial counsel argued that they

6

had lost contact with two key witnesses—A.B. and Sister. The State argued that from the time that Hines was jailed on July 22, 2020, to present, Hines had never indicated he was ready to proceed to trial or requested a trial date until February 22, 2021, at which time a trial date was set. The trial court denied the motion stating:

> There's also something that I think everyone's failed to mention in the intervening time is that COVID restrictions have not allowed us to actually have jury trials even if your client wanted to have a jury trial and because of that I don't believe his due process rights could be violated if we weren't able to have a jury trial based upon a pandemic.

A two-day jury trial commenced on April 6, 2021. Victim testified, along with Barbara Fulton, the CAC interviewer, nurse examiner Wilson, and Detective Counts as part of the State's case in chief. After having objected during a pretrial hearing, the State stipulated to admission of A.B. and Sister's interviews with police. These interviews were contained in Exhibit 8, which was admitted at trial and played for the jury.

Hines, in his testimony, admitted to living with A.B. and Victim. Hines stated that on occasion, Victim would sleep with him and A.B., but always on A.B.'s side of the bed. He eventually broke up with A.B. and moved to Florida. Hines testified that the Fultons had "wanted" Victim since she was two years old, and he was certain that the Fultons had "set up a sting operation[]" regarding the drug house "for the intent of getting [Victim]."

Hines denied the allegations against him and testified that he only told Detective Counts that Victim performed oral sex on him because "that was the ends to this confrontation."

The jury found Hines guilty of statutory sodomy in the first degree and sentenced Hines to 75 years in prison.

7

On April 12, 2021, Hines filed a "Motion for Judgment of Acquittal Notwithstanding Jury's Verdict or for New Trial" asserting, in part, that the trial court erred in denying Hines' motion to dismiss and motion to suppress. The trial court denied the motion. This appeal followed.

In two points on appeal, Hines asserts:

I.

The trial court clearly erred overruling [Hines'] motion to suppress statements and abused its discretion admitting the Exhibit 10 interrogation video and Exhibit 11 apology letter in derogation of [Hines'] rights to due process of law and against self-incrimination under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 19 of the Missouri Constitution, in that [Detective] Counts' strategic and pervasive use of deliberate falsehoods and indirect promises of leniency during [Hines'] interrogation were so coercive as to render his subsequent statements involuntary; because his oral and written confessions are *sui generis* evidence of guilt, [Hines] was prejudiced by their admission.

II.

The trial court abused its discretion overruling [Hines'] motion to dismiss and entering sentence and judgment against him for first-degree statutory sodomy in derogation of his rights to a speedy trial and to due process of law guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 18(a) of the Missouri Constitution, in that, where the delay in bringing him to trial was presumptively prejudicial, the government was chiefly responsible for any delays, [Hines] timely asserted his speedy trial right, and where [Hines] lost the live testimony of [Sister] and [A.B.] contradicting [Victim]'s allegations due to the delay, the balance of these factors deprived [Hines] of his speedy trial right.

**Standard of Review**

***Point I: Motion to Suppress and Alleged Involuntary Statements***

In reviewing the trial court's decision denying a motion to suppress, "[o]ur review of the trial court's ruling on a motion to suppress evidence is limited to a determination of whether the evidence was sufficient to support the trial court's ruling." ***State v. Norman***, 431 S.W.3d 563, 568 (Mo.App. E.D. 2014). "This Court reviews a trial court's ruling on a motion to suppress in the light most favorable to the ruling and defers to the trial court's determinations of credibility." ***State***

8

*v. Rice*, 573 S.W.3d 53, 66 (Mo. banc 2019) (internal quotation and citation omitted). An appellate court will only reverse a trial court's ruling on a motion to suppress if the decision is clearly erroneous. *State v. Trent*, 618 S.W.3d 616, 621 (Mo.App. S.D. 2020). A ruling is clearly erroneous if the court is "'left with a definite and firm belief a mistake has been made."' *Rice*, 573 S.W.3d at 66 (quoting *State v. Holman*, 502 S.W.3d 621, 624 (Mo. banc 2016)). Upon review of a trial court's ruling on a motion to suppress, the court will consider all evidence presented at trial, as well as the evidence presented at the suppression hearing. *State v. Howland*, 576 S.W.3d 619, 622 (Mo.App. S.D. 2019). The State has the burden of production and persuasion to show by a preponderance of the evidence that a defendant's motion to suppress should be overruled at trial. *Norman*, 431 S.W.3d at 568.

**Analysis**

Hines argues that the trial court clearly erred overruling Hines' motion to suppress statements and abused its discretion in admitting Exhibit 10 (interview video) and Exhibit 11 (apology letter). Hines suggests that this violated his right to due process and against self-incrimination, in that:

> [Detective] Counts' strategic and pervasive use of deliberate falsehoods and indirect promises of leniency during [Hines'] interrogation were so coercive as to render his subsequent statements involuntary; because his oral and written confessions are *sui generis* evidence of guilt, [Hines] was prejudiced by their admission.

Involuntarily obtained confessions are barred from being admissible at trial by the Due Process Clause. *State v. Faruqi*, 344 S.W.3d 193, 203 (Mo. banc 2011) (citing *Ashcraft v. Tennessee*, 322 U.S. 143, 155 (1944)). "The test for whether a confession is voluntary is whether the totality of the circumstances created a physical or psychological coercion sufficient to deprive the defendant of a free choice to admit, deny, or refuse to answer the examiner's questions." *Id.*

9

(internal quotation and citation omitted). "In determining whether a defendant's confession resulted from improper coercion, this Court considers a range of factors relating to the defendant, including his or her age, experience, intelligence, gender, lack of education, infirmity, and unusual susceptibility to coercion." *Id.* (internal quotation and citation omitted). "The Court also considers whether the defendant was advised of his rights, the length of the detention, the repeated and prolonged nature of the questioning, and the use of coercive techniques such as deprivation of food or sleep." *Id.*

Hines' primary argument is that the Reid interrogation technique used by Detective Counts to misrepresent or lie to defendants is not reliable and does not produce voluntary statements. Hines argues that any interview conducted under the Reid technique should be deemed involuntary as a matter of law, unless the State presents affirmative evidence that the use of the Reid technique "was objectively more likely than not to produce a true confession[.]" Hines fails to cite any authority for this proposition. Hines' argument fails because we are bound by our standard of review and Missouri caselaw precedent. As the State correctly points out, we are to review under the "totality of the circumstances" whether Hines' statements were voluntary.

After reviewing the entire record and considering the totality of the circumstances, we do not find Hines' statements were involuntary. Hines was a middle-aged, 38-year-old man when he was interviewed by law enforcement. Hines appeared intelligent during his interview, and nodded yes when Detective Counts said "you're a pretty sharp guy." *See Faruqi*, 344 S.W.3d at 203.

Further evidence that Hines' statements were voluntary was his familiarity with the criminal justice system. "Prior experience with the criminal justice system is relevant as to the extent to which police custody and interrogation affect the psychological interplay of emotion and will." *State v. Stokes*, 710 S.W.2d 424, 430 (Mo.App. E.D. 1986). Hines indicated that he had

10

gone through the criminal justice process with his marijuana possession case, which included being fingerprinted and jailed for 26 days. He also stated that he had a "prohibited weapons charge[.]" Hines was clearly familiar with the criminal justice process.

Hines was given a *Miranda* form—that he read aloud and signed—and then continued speaking with law enforcement. "The waiver of *Miranda* rights, while not dispositive of the question of voluntariness, is an important consideration." *State v. Dixon*, 332 S.W.3d 214, 218 (Mo.App. E.D. 2010). Furthermore, Hines consented to a police search of his cell phone, and signed a consent form, further indicating that he was acting voluntarily.

The record is silent to oppressive, uncomfortable or coercive conditions during the interview. The interview was conducted in a calm and relaxed manner; there was no yelling or raising of voices by either Detective Counts or Hines; Detective Counts did not place Hines in handcuffs or otherwise restrain him; and Detective Counts did not physically touch Hines or threaten him in anyway. Hines drove his own car to the police station and was free to leave at any time. Hines was afforded many breaks, and at one point during the interview, Hines was permitted to go outside and raise his car windows. Hines was not isolated during the interview in that he had his cell phone with him throughout the interview, which he used to make a 4-minute call to his sister, answered a telemarketing call, and used multiple other times throughout the interrogation. Hines was not deprived of food or water during the interview, as he was given bottled water and gum.

Hines agreed to speak freely to Detective Counts, responded to his questions, and never indicated that he did not want to speak with Detective Counts. In fact, Hines was so free with his

11

commentary that he discussed and admitted information most people would not discuss with law enforcement.[4]

The length of the interview did not create a hostile or oppressive atmosphere such that Hines' confession was involuntary as Hines was only interviewed for approximately one hour and forty-five minutes before he admitted to having oral sex with Victim. The interview in total only lasted two hours and fifteen minutes. *See* **Phillips**, 319 S.W.3d at 477 (the court held a four-and-a-half-hour interview not to be coercive); **State v. Smith**, 735 S.W.2d 65, 68 (Mo.App. E.D. 1987) (the court held defendant's confession to be voluntary when it came after six-and-one-half hours in custody with intermittent interrogation).

Hines also argued that "[Detective] Counts' strategic and pervasive use of deliberate falsehoods and indirect promises of leniency during [Hines'] interrogation were so coercive as to render his subsequent statements involuntary[.]" "[A] statement is not voluntary and is inadmissible if it was extracted by promises, direct or implied." **Dixon**, 332 S.W.3d at 218. "A promise to a defendant in custody does not *per se* make any statement he gives thereafter involuntary." **Id.** (internal quotation and citation omitted). In determining if the defendant's will was overborne by the promise of leniency, the court must consider all the circumstances surrounding the statement: (1) "[t]he nature of the promise must be considered[]"; (2) "[t]he promise must be positive in its terms and clear in its implication[]"; and (3) "[t]he promise must directly relate to the crime charged and be made by one in authority to deliver it." **Id.** "Whether

---

[4] Hines admitted to cheating on A.B.; that he trespassed to go fishing; that he had a substance abuse issue and had worked at an "adult camp" where "you could get any kind of drug you could possibly handle"; that his drug of choice "his whole life" was marijuana; that he smoked methamphetamine once or twice; gave details of his intimate relationship with A.B.; that he did not have a bumpy penis; and discussed his masturbation habits, which included watching pornography.

a statement is admissible hinges on its voluntariness in light of the totality of the circumstances, not on whether a promise was made." *Id.* (internal quotation and citation omitted).

A review of the record demonstrates that Hines' will was not overborne by Detective Counts' false representations or alleged indirect promises of leniency rendering his statements involuntary. In the interview, Hines never became emotional, nor did he cry, even when he admitted to having oral sex with Victim. Hines did not appear to be distressed during the interview or intimidated by Detective Counts. Instead, Hines joked with Detective Counts throughout the interview even in the moments leading up to his admission of guilt.

After Hines admission, Detective Counts asked Hines if he wanted to write an apology letter to Victim. Immediately thereafter, Detective Counts announced he needed to make a phone call, and then Detective Counts verbally reminded Hines that if he wanted to make a written statement, it would have to be Hines' decision. Detective Counts offered a sheet of paper to Hines, walked out of the interview room, and Hines immediately proceeded to write an incriminating statement of his own volition, thereby demonstrating his will was not overborne by Detective Counts.

Hines further argues that Detective Counts "indirectly promised leniency" by "lying about [Detective Counts'] uncle's minimal prison time." Detective Counts acknowledged that his uncle did a "little bit of time," which is not the same as saying "minimal time." "[O]fficers' statements to a suspect that cooperating is in his or her best interests are not improperly coercive and do not, as a matter of law, render a confession involuntary." *State v. Simmons*, 944 S.W.2d 165, 175 (Mo. banc 1997). "If Defendant had a hope of leniency, that hope sprang from the seeds of his own planting and is not sufficient to render the resulting confession inadmissible." *State v. Weicht*, 23 S.W.3d 922, 928 (Mo.App. S.D. 2000) (internal quotation and citation omitted).

13

Hines also argued that the hope for divine salvation overbore his will. Hines argues that Detective Counts gave him "assurance of divine salvation" when Detective Counts said that "God forgives," that the "Salem judge and prosecutor have forgiveness mindset that is not a years in prison mindset, but helping people out of holes" and that "[m]e and you having this conversation is me trying to help you out of a hole." This Court has expressly held that a confession is not involuntary even when police make appeals to religion. "Only threats of harm or promises of worldly advantage, as opposed to moral and spiritual entreaties, can yield involuntary confessions." *Phillips*, 319 S.W.3d at 478 (internal quotation and citation omitted).

Finally, the fact that Detective Counts provided Hines with falsehoods regarding the investigation does not *per se* invalidate Hines' confession. "Trickery does not necessarily render statements involuntary, and therefore, inadmissible." *Faruqi*, 344 S.W.3d at 204 (internal quotation and citation omitted). "Statements obtained by subterfuge on the part of police are admissible unless the deception offends societal notions of fairness or is likely to produce an untrustworthy confession." *Id.* (internal quotation and citation omitted). Hines complains that Detective Counts told him that Victim had taken two polygraph tests; that there was evidence that something penetrated Victim's vagina; and that he "knew" that Hines had done something. This Court has previously held that such false statements have not been held to make a confession involuntary. *Trent*, 618 S.W.3d at 622 (officers' false representations about cell phone records and the witnesses did not offend societal notions of fairness where law enforcement falsely suggested to defendant that they had access to location data from defendant's cell phone and had received reports from witnesses identifying a vehicle similar to defendant's near the location of the murder).

14

We cannot conclude that Hines' will was overborne from Detective Counts' misrepresentations or alleged indirect promises of leniency rendering Hines' statements involuntary—Hines' statements were voluntary. The trial court did not err in not suppressing Hines' interview video and apology letter because under the totality of the circumstances, Hines' statements were voluntary. Hines' Point I is accordingly denied.

**Standard of Review**

***Point II: Motion to Dismiss – Violation of Right to Speedy Trial***

When we review a trial court's denial of a defendant's motion to dismiss based on defendant's right to a speedy trial, we defer to the trial court's factual findings and credibility determinations, and review legal issues *de novo*. **State v. Sisco**, 458 S.W.3d 304, 312-13 (Mo. banc 2015).

**Analysis**

Hines argues in his second point that the trial court erred in overruling his motion to dismiss in violation of his right to speedy trial. Hines asserts that he was denied his right to a speedy trial because: (1) "the delay in bringing him to trial was presumptively prejudicial[]"; (2) "the government was chiefly responsible for any delays[]"; (3) he properly "asserted his speedy trial right[]"; and (4) due to the delay, Hines lost the live testimony of two witnesses, Sister and A.B., who would have contradicted Victim's testimony that she told Sister and A.B. of Hines' sexual abuse.

Determining whether a defendant's right to a speedy trial has been violated requires a balancing of four factors: "(1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) the prejudice to the defendant resulting from the delay." **Sisco**, 458 S.W.3d at 313.

15

There is no necessity for inquiry into the other factors "until there is some delay which is presumptively prejudicial[.]" *Id.* (internal quotation and citation omitted). Our courts have found a delay of greater than eight months is "presumptively prejudicial." *Id.* "The delay in bringing a defendant to trial is measured from the time of a formal indictment or information or when actual restraints are imposed by an arrest." *Id.* However, delays attributable to defendant's continuances, motions, or other actions must first be subtracted from the total delay. *State v. Howell*, 628 S.W.3d 750, 758 (Mo.App. E.D. 2021). Courts consider "the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination[,]" if a delay was for a period of time that is presumptively prejudicial. *Sisco*, 458 S.W.3d at 313 (internal quotation and citation omitted). This latter inquiry "'is significant to the speedy trial analysis because, as we discuss below, the presumption that pretrial delay has prejudiced the accused intensifies over time.'" *State v. Fisher*, 509 S.W.3d 747, 752 (Mo.App. W.D. 2016) (quoting *Doggett v. United States*, 505 U.S. 647, 651-52 (1992)).

Hines was arrested on July 22, 2020, and his trial began on April 6, 2021—a delay of 8 months and 15 days. However, any delay attributable to Hines that is 15 or more days would cause his claim to fail because the delay is only 15 days beyond the 8-month presumption of prejudicial threshold.

Hines initially caused a 37-day delay (September 28, 2020 to November 4, 2020) by filing a Motion to Suppress on September 11, 2020, which was prior to the September 28, 2020 hearing to schedule a trial date, resulting in his case being continued to November 4, 2020, so that the trial court could hold a hearing on his motion. After hearing argument on November 4, 2020, the trial court then reset the case for a ruling on the motion to suppress and for a trial setting to November 23, 2020, and Hines did not object at that time.

16

On November 13, 2020, the November 23 hearing was reset to December 14, 2020, due to COVID restrictions imposed on the trial court, with the caveat that the trial court would "be in session and, if requested, can be available by Webex to take up 'the most critical' matters and 'proceedings necessary to protect the constitutional rights of criminal defendants[,]'" and "to contact the Circuit Clerk as soon as possible to request the matter be placed back on the docket and so a specific time slot can be given for the hearing" if such a proceeding was necessary. Hines did not object nor did he notify the trial court that his speedy trial request was a constitutional right that he wanted to remain protected, thereby essentially acquiescing to the delay. A defendant "cannot complain on appeal if he expresses apparent satisfaction with the action of the trial court." *State v. Evenson*, 35 S.W.3d 486, 492 (Mo.App. S.D. 2000) (internal quotation and citation omitted); *State v. Pickens*, 332 S.W.3d 303, 319 n.14 (Mo.App. E.D. 2011).

On November 22, 2020, the trial court, by docket entry, overruled Hines' Motion to Suppress. This additional 18-day delay (from November 4, 2020 to November 22, 2020) is attributable to Hines. Subtracting the total 55-day delay (September 28, 2020 to November 22, 2020) from the total delay of 8 months and 15 days, places the total delay below the 8-month presumption of prejudicial threshold. Hines' claim that the delay in bringing him to trial was presumptively prejudicial fails. Therefore, there is no need to discuss the other three factors that are a part of the balancing process in such claims. *See State v. Greenlee*, 327 S.W.3d 602, 611 (Mo.App. E.D. 2010). Hines' Point II is denied.

The judgment of the trial court is affirmed.

WILLIAM W. FRANCIS, JR., P.J. - OPINION AUTHOR

JEFFREY W. BATES, J. - CONCURS

JACK A. L. GOODMAN, J. - CONCURS